**STOCK & GROVE, INC.**
v.
**The UNITED STATES.**
No. 495–71.

United States Court of Claims.
March 20, 1974.

Richard M. Stanislaw, Seattle, Wash., attorney of record for plaintiff.

Sam E. Baker, Jr., and DeGarmo, Leedy, Oles & Morrison, Seattle, Wash., of counsel.

Ray Goddard, · Washington, D. C., with whom was Acting Asst. Atty., Gen. Irving Jaffe, for defendant.

Before DAVIS, SKELTON, and NICHOLS, Judges.

PER CURIAM:

This case comes before the court on defendant's request for review of the opinion filed by Trial Judge C. Murray Bernhardt on March 7, 1973, pursuant to Rule 54(b)(3), and plaintiff's response thereto. It has been submitted on the briefs and oral argument of counsel. It arises out of the denial by the Department of Transportation Contract Appeals Board, 70–2 BCA ¶ 8589, of a claim under the "Disputes" clause of a contract between plaintiff and defendant. The claim asserts a right to an equitable adjustment. The court has made certain modifications in the said opinion and agrees with the same, as modified, affirms and adopts the same as the basis of its judgment.

As fully appears in the opinion, the plaintiff was awarded a contract for the repair of a road skirting the perimeter of Douglas Island, near Juneau, Alaska. The road had suffered erosion damage from the sea. The contract designated a stretch of rocky land adjacent to the road as Quarry No. 1 and required plaintiff to quarry therefrom a sufficient number of pieces of "armor stone" to be placed on the seaward side of the road to protect it against further erosion. Armor stone was defined as hard, durable, rough, angular stone in pieces of two to six tons, having a specific gravity not under 2.80, and meeting a number of other requirements. Plaintiff encountered difficulty getting armor stone from Quarry No. 1 and eventually defendant agreed to use of another quarry, and still later, it relaxed its armor stone specifications, enabling plaintiff to complete the contract. The claim is primarily for a Category 1 changed condition, i. e., subsurface or latent physical conditions at the site differing materially from those "indicated" in the contract. Such a claim requires the Board, and this court in a Wunderlich Act review, 41 U.S.C. §§ 321, 322, in passing on entitlement, to determine what conditions were "indicated" in the contract, and then to what extent the actual subsurface or latent conditions differed. Nevertheless, the Board, and the trial judge on review, both run through a series of alleged derelictions by plaintiff in prebid planning and post award performance. The trial judge shows that many of the Board's conclusions therein lack the support of substantial evidence. We consider that the plaintiff's alleged performance deficiencies are perhaps

marginally relevant as to entitlement, because they bear on whether it was the changed condition, or the alleged deficiencies in planning and performance, that caused plaintiff's losses.

Focusing, as the court deems it should, first and foremost on the contract indications, the contract designation as Quarry No. 1 of a rock cliff alongside the road between stations 531 and 539 constituted a representation of defendant's belief that by use of correct quarrying techniques, sufficient armor stone could be obtained from that source. The other significant indication was a memorandum of January 24, 1967, by Edward R. Walter, the Project Engineer, hereinafter called the Walter memo. It was made available to bidders. It states that on January 20, a group of officials had inspected the site and concluded that the high ledge formation at stations 535 to 539 would be a superior source for large size (2 tons plus) riprap stone over the lower formation at 521 + 50 to 526 + 50. Another official group, according to the Walter memo, inspected the rock sources on January 23, this time including Mr. J. R. Daniel, a geologist with considerable first-hand experience in blasting work. He too favored the high ledge source, stations 535 to 539, and "felt" a yield of 50% armor stone of two tons plus could be obtained there, as against 15% at stations 521 to 526. He went on to recommend a blasting technique which the memo describes. That a person "feels" a certain thing to be true, is one of these ambiguous indications beloved of Government officials. At least, it denotes that a thing is considered more probably true than not.

The Board held in effect that plaintiff should have disbelieved these indications or at least have allowed a cushion in its bid against their being fallacious, because of other indications. These included a report dealing with testing and analysis of selected rock samples from scattered points in the selected quarry. Nowhere does this report say the samples tested out as non-specification rock,

except that one sample was below the required specific gravity. We think an ordinary bidder would have concluded that the geologist, Mr. Daniel, had taken rock samples into account and discounted them so far as they reflected against Quarry No. 1 as a source. (Not the same samples, as the ones above mentioned were collected later.) Again, the Board refers to the observable geologic structure at the Quarry, which, it says, would indicate to a trained engineer or geologist that the production of the Quarry would be questionable and the nature of the rock would cause difficulty. Specifically, the shaley ledge relied on by plaintiff as a latent condition outcropped and could be seen. Plaintiff, however, was not required to hire its own geologist, and was entitled to suppose Mr. Daniel or other of defendant's experts had seen the shale outcropping too.

In determining what the contract indicated, we think the Board erred as a matter of law, in a Category 1 claim, by imposing upon the bidder in these circumstances an obligation to make a scientifically educated and skeptical analysis of the contract, as defendant proffered it for adhesion, and the official documents made available for bidders therewith. What the contract, as thus supplemented, said, it "indicated". This is not to say, of course, that such indications would excuse a site inspection or that such site inspection need not discover patent indications plainly, to a layman, contradicting the contract documents. That is not this case.

If it were as apparent as the Board now holds, that Quarry No. 1 was no better than a marginal source of armor stone, the defendant committed a serious breach of duty in putting out the Walter memo with the bid documents. As we said in Womack v. United States, 389 F.2d 793, 801, 182 Ct.Cl. 399, 412 (1968):

An estimate as to a material matter in a bidding invitation is an expedient. Ordinarily it is only used where

there is a recognized need for guidance to bidders on a particular point but specific information is not reasonably available. * * * Intrinsically, the estimate that is made in such circumstances must be the product of such relevant underlying information as is available to the author of the invitation. If the bidder were not entitled to so regard it, its inclusion in the invitation would be surplusage at best or deception at worst. Assuming that the bidder acts reasonably,[3*] he is entitled to rely on Government estimates as representing honest and informed conclusions * * * (* Footnote omitted.)

■ However, in considering what the contract indicated, the Board rightly put to one side, as does the trial judge, contract clauses that designated Quarry No. 1 as a "type B source" and indicated that defendant would not make an equitable adjustment if contractor should "elect" to use a type B source and found it did not contain sufficient acceptable material. The contract said that if contractor elected a type A source, which failed, such an adjustment would be made. Yet the contract designated no type A alternative and none was ever designated. Of type B sources it designated only the one already mentioned. Plaintiff could abandon or reject use of the one type B source only with defendant's approval, which was for some time, until the source's established failure, not forthcoming. It had no election in fact. The word "elect" therefore must be regarded as a term of art, having a meaning other than its meaning in ordinary speech, if plaintiff is deemed to have made an "election" barring it from recovery here. Clauses to whittle down or cut back the Changed Conditions clause, which is prescribed for Government contracts, are not broadly or sympathetically interpreted. Morrison-Knudsen Co. v. United States, 397 F.2d 826, 829, 841–842, 184 Ct.Cl. 661, 666, 685–686 (1968). The language does not expressly say that defendant refuses to take responsibility for the correctness of its selection of a quarry, and it should not be construed to warn by implication that the Walter memo was not to be trusted in that particular.

■ Once the proper distinction is made between patent and latent conditions, in the context of express contract indications and a Category 1 Changed Condition claim, the Board's conclusion that any bidder (with the best engineering and geological advice) could have determined that Quarry No. 1 was no better than a marginal source of armor rock, if that, militates against rather than for the Board's ultimate decision. If the contract indications were as stated in the Walter memo, there can be no question but that Quarry No. 1 fell far short of these indications, and that is all that is required to make a changed condition.

■ Defendant's strongest point here, rightly stressed on oral argument before us, is that plaintiff never quarried between stations 535 and 539, indicated in the Walter memo as the best source. Therefore, no one knows for sure whether the latent conditions there were or were not favorable. Defendant would have preferred for plaintiff to try blasting, particularly from the high cliff at stations 537 to 539, instead of in the lower other half of the designated quarry, stations 531 to 535, where plaintiff made all its trials. However, the formation of rock was the same throughout. Plaintiff believed its blasting in stations 531–535 demonstrated that the entire formation was unsuitable. Since one of the defects was that the rock fractured too easily, blasting it off the face of a high cliff was not likely to be more successful. Defendant acquiesced in the change and agreed plaintiff might quarry at another location. In light of the evidence defendant produced at trial that plaintiff should have discovered even before bidding that the entire quarry was at best marginal, it cannot be said with support of substantial evidence that plaintiff had to try out stations 537–539 to establish that latent conditions there were unfavorable, at

cost of delaying its trials of different formations that looked more promising. Defendant's own witness, McCreary, testified that the rock at stations 537–539 would have yielded only 10% armor stone, about the yield at stations 531–535.

Defendant's motion for summary judgment is denied. The plaintiff's motion for summary judgment is granted. The case is remanded to the Department of Transportation Contract Appeals Board for a period of three months, under Public Law 92–415, for determination of the quantum of equitable adjustment to which plaintiff is entitled. The attorney for the plaintiff shall be responsible for keeping the court advised periodically as to the status of the proceedings on remand, pursuant to General Order No. 3 dated December 12, 1972.

Trial Judge Bernhardt's opinion, as modified by the court, is as follows:

This action is to review under standards of the Wunderlich Act, 41 U.S.C. §§ 321–322, a decision on November 20, 1970, of the Department of Transportation Contract Appeals Board denying plaintiff's appeal from an adverse decision of the contracting officer. Essentially it concerns plaintiff's claim that the failure of a Government designated quarry source for rock constituted a changed condition entitling plaintiff to an equitable adjustment of the contract price.

A bid contract was awarded plaintiff by the Federal Highway Administration on July 6, 1967, and performed from July 27, 1967, to completion and acceptance on July 2, 1968. All but 12 days of time overrun beyond the original performance period of 105 days was made up by a time extension. The contract was for the reconstruction of a 4,700 foot stretch of wave-eroded roadway which was a recently completed portion of a road still under construction in other reaches skirting the perimeter of Douglas Island, 14 miles northwest of Juneau, Alaska. The work included a 4 foot grade raise for the road, extension of existing culverts, construction of special subbase overlay and beam-type guard rail, and construction of a 4 foot high protective rock embankment on the seaward side of the road. The embankment, which is the only item of work involved in the present litigation, was to conform to a 2:1 slope (2′ horizontal to 1′ vertical) and was to consist of a base of Case 2 borrow[1] topped by a double layer of 78,000 tons of "hard, durable, rough" armor stones, each armor stone to range in weight from 2 to 6 tons, with its largest dimension no more than 3 times its smallest dimension. Armor stone was referred to in the contract as the "major item."

Case 2 borrow (i. e., clean quarry run rock) and armor stone were to be obtained from the same quarry site, it being contemplated that the quarry run rock would be obtained as a byproduct of blasting for armor stone. At $120,000 for the quarry run rock and $249,000 for the armor stone, these items together represented approximately 86 percent of the total contract price of $428,472.50.

Sheet No. 5 of a set of plans accompanying the invitation to bid designated a rock cliff alongside the road between stations 531 and 539 (each station embraced a linear 100 feet) as a type B source quarry site for plaintiff to obtain the necessary quarry run rock and armor stone. The designated quarry site (Quarry No. 1) was part of a cliff varying in height to substantially more than 100 feet and extending throughout and beyond the section of the roadway to be reconstructed. FP–61, Standard Specifications for Construction of Roads and Bridges on Federal Highway Projects published by the Bureau of Public Roads in January 1961, was incorporated into the contract by reference. Article 6.1 thereof authorized the Government to designate either type A or type B pit

---

1. An unstated portion of the specified 60,000 tons of Case 2 borrow was to be used to elevate the roadbed, and the rest as a base for the embankment slope.

and quarry sources, the difference between the two being that the Government assumed responsibility for the adequacy of a type A quarry as the source of acceptable material, whereas the contractor would have to satisfy himself as to the quantity of acceptable material available from a source designated by the contract as type B, or find some other source approved by the Government. Article 6.1(b)2 of FP–61 provided as follows:

*Type B sources.* Should the contractor elect to obtain material from a type B source and it is subsequently found that the source contains insufficient acceptable material to meet the contract needs and it becomes necessary for the contractor to select a new source, or if the contractor chooses, for some other reason, to change the source of material, no adjustment in payment or contract time will be made.

Neither the Board, nor the defendant now, argues that this provision of FP–61 as to the designation of the type B quarry source negates the remedial provisions of the Changed Conditions clause. That issue has been settled by Morrison-Knudsen Co. v. United States, 397 F.2d 826, 829, 841–842, 184 Ct.Cl. 661, 666, 685–686 (1968).

The contract contains the standard construction contract clause on Changed Conditions as Article 4, as well as the standard Disputes clause providing an appeal mechanism.

In January 1967, Government representatives searched the immediate worksite vicinity for a suitable source of rock for the prospective project, took rock samples then and later from the face of the Quarry No. 1 area for laboratory testing and, on the basis of visual inspection coupled with geological analyses of the samples, designated Quarry No. 1 between stations 531–539 as a type B source.

Plaintiff's president and its job superintendent made a thorough prebid site inspection, with particular attention being paid to the designated rock source at Quarry No. 1.

Plaintiff's low bid was accepted. Work was started July 31, 1967, and plaintiff immediately encountered difficulties in obtaining armor stone of the required size from Quarry No. 1. Convinced after 10 blasts that Quarry No. 1 was not a suitable source for armor stone, plaintiff moved its blasting operations on September 12, 1967, to another location between stations 506–510 (Quarry No. 2) with Government approval, only to find after several blasts that the rock there was but little better than at Quarry No. 1 as a source of armor stone. It broke into pieces too large or too small for armor stone. On secondary blasting of the large pieces they fragmented too small for armor stone. About 25 percent of the armor stone obtained broke upon being dumped onto the embankment in a manner sanctioned by the contract. Plaintiff virtually ceased operations at Quarry No. 2 from September 25 to October 28, 1967, and in the meantime endeavored to obtain a design change for the embankment which would eliminate the requirement for outsize armor stones and permit the use of smaller rock which the adjacent quarry sources could provide. Plaintiff scouted the area for 20 miles in a fruitless search for a rock source better than those at the worksite. Finally on October 26, 1967, after the rejection as unsatisfactory of an earlier version tendered by the Government on September 29, 1967, Change Order No. 2 was issued altering the embankment design as plaintiff had requested, at no greater cost to the Government, but involving a greater tonnage of stone of smaller dimensions and in a flatter embankment configuration than under the original contract, and work resumed under the new specifications until winter weather caused a total suspension from December 22, 1967 to April 4, 1968. Work then resumed once more and the project was accepted as complete on July 2, 1968.

The plaintiff's petition sounds partly in breach of contract for misrepresentation and violated warranty. There is no need to consider breach of contract counts since an administrative remedy exists under the contract from the same facts. Plaintiff also contends that the Board decision as to changed conditions determines a question of law rather than fact, and is therefore not entitled to the finality effect of the Wunderlich Act. Otherwise, plaintiff contends that the Board's decisions as to deficiencies in plaintiff's prebid planning and in its drilling and blasting methods, as well as to the adequacy of Quarry No. 1 as a source of suitable rock, were in error and not supported by substantial evidence in the record.

The findings of the Board that are specifically attacked by plaintiff are summarized by the Board as follows:

* * * we conclude, and find as fact, that appellant's inability to quarry sufficient armor stone in the listed source [Quarry No. 1] was caused by its failure to properly evaluate the site conditions shown by the contract data, to plan and execute proper quarry production methods and to utilize all of the indicated source. We further find that there is inadequate proof that the shale dike was a substantial cause of appellant's stone production difficulties. For these reasons, we conclude that appellant has failed to prove the existence of a changed condition in the listed source. Board slip op. p. 25.

██ To the extent that the Board's decision was on legal matters it erred. Its factual decisions are not supported by substantial evidence and must therefore be reversed. We shall consider the Board's decisions on the several issues in the order enumerated.

A. *Prebid evaluation of site conditions*

1. *By the Government*

On January 20, 1967 and January 23, 1967, groups of representatives from the Federal Project Office at Juneau inspected possible rock sources at the future worksite. Besides Mr. Walter, the project engineer, the groups included among others Mr. Munson, a geologist from the Juneau District Laboratory, and Mr. Daniel, a geologist from Hercules, Inc., a powder supplier, who had extensive rock blasting experience.

On January 24, 1967, Mr. Walter prepared a memorandum which was subsequently available to bidders, including plaintiff. The memorandum reported a consensus view that the best available source of rock was a high ledge formation between stations 535–539, within the subsequently designated Quarry No. 1 site at stations 531–539. The memorandum reported and tacitly subscribed to the opinion of Mr. Daniel that suitable blasting procedures could yield 50 percent armor stone from the favored location, whereas the prospective yield at another location also inspected at stations 521–526 would be only 15 percent. Mr. Daniel recommended suitable blasting procedures consisting of a series of four blasts, each using a pattern of lightly loaded holes drilled vertically into the top of the rock face 15 feet back from the edge (known as "downholes"), along with more heavily loaded horizontal "lifter" holes drilled along the bottom of the face, plus secondary blasting of larger rocks thus obtained to reduce them to required size. These procedures are explained at a later point in the opinion. It must be construed that Mr. Walter's memorandum represented his and the Government's belief at the time that the selected source would, if properly worked, yield 50 percent armor stone and the balance either quarry run rock, or waste, for there was no indication in the record of disclaimer or change of opinion prior to contract award. The relative proportions of quarry run rock and armor stone required to meet the requirements of the project designed by Mr. Walter would tend to confirm the armor stone yield estimate as stated in his January 24 memorandum.

In January and May 1967, an inspector from the State of Alaska Department of Highways removed a 35-to-50 pound sample of rock from each of seven locations in the rock face between stations 532 + 20 and 537, within the Quarry No. 1 area. The samples were analyzed and a report of geological analysis was prepared as to each sample, which reports were available to bidders. The presence of several kinds of rock was indicated, including elements of shaley slate and slate in the samples taken from stations 533 + 75 and 535. In each case the report described the engineering qualities of the rock sample according to hardness, durability, and toughness, being qualities later specified for the armor stone needed for the contract in suit. Article 511–2.1. These engineering qualities in the seven samples ranged collectively from fair-to-good, to moderate, to good. The reports also stated in most instances that the rock was of a type which breaks into irregular or angular wedges, plates and/or small blocky pieces. Mr. Munson testified at the Board hearing that the samples would not necessarily reflect the constituency of the large expanse of rock face from which they were random selected, nor were borings made to determine whether the rock would change in character beneath the surface.

In addition the contract documents available to bidders included a Materials Report based upon investigations made by the Government in 1961, 1962, and 1964 of the subsurface composition of the proposed site for the road around Douglas Island, and of sources of material for the road such as gravel, etc. The Materials Report, which had been prepared for the earlier contract to construct the entire road, contained no references to quarry sources of rock for bidders on the contract in suit, and so was of no value to them at all as to the issue under consideration.

On the basis of its inspections and geological analyses described above, the Government selected and designated Quarry No. 1 as a type B source. Mr. Munson, the geologist who had participated in the selection and sample testing procedure, testified at the Board hearing that the quality of the rock at Quarry No. 1 varied. He believed the best rock to be in the high ledge at station 537–539 because it appeared to be more massive and harder than the rock elsewhere, although it contained numerous fractures and bedding planes, i. e., planes of weakness in rock formations which are not already fractured but which are susceptible to fracturing upon the application of force such as by drilling or blasting. He testified that the prevalence of bedding planes and slate which were visible in the rock face would give him concern and suggest difficulty in obtaining large armor stone of the dimensions required by the contract. In his view the rock, specifically that at stations 536 and 537, was only a marginal source for armor stone. He recognized that parts of the rock face at stations 537–539, other than the high ledge he recommended, would probably not be suitable. He also expressed doubt as to whether the prevalent bedding seams would permit the obtaining of armor stone to be economically feasible due to the excessive potential waste factor, unless unusual processing methods were employed. This last statement is contradictory to the statement in Mr. Walter's January 24 'memorandum, *supra,* that the formation should yield 50 percent armor stone, with the remaining 50 percent presumably being quarry run rock and an unstated amount of waste, unless the "unusual processing methods" referred to in Mr. Munson's appraisal would have improved the assay commensurately.

Another Government witness, a Mr. McCreary who was a heavy construction engineer, provided testimony at the Board hearing. On the basis of an inspection of the worksite long after completion of the contract, he said that plaintiff should have anticipated the armor stone yield of the unworked portions of designated Quarry No. 1 from stations 536–539 to be about 10 percent,

even if it had studied the sample analyses and proper drilling and blasting methods were used, which conflicts diametrically with Mr. Walter's memorandum of January 24, *supra*. Mr. McCreary thought that plaintiff should have tested the rock source before bidding by detonating experimental shots at a few locations. The court has said that "The duty of the bidders to investigate the site did not require them to conduct geological or other technical investigations, costly and perhaps impossible * * *." Foster Constr. C. A. v. United States, 435 F.2d 873, 888–889, 193 Ct.Cl. 587, 616 (1970).

### 2. *By the plaintiff*

Prior to bidding the plaintiff's president, Mr. Stock, who had many years of experience in road construction jobs in Alaska, including 22 years with plaintiff company, inspected the worksite on three or four occasions. He and his superintendent, Mr. Taylor, drove around the site and alighted to inspect the designated Quarry No. 1. Availability of specification rock was to them the most important part of the prebid inspection. Mr. Taylor made five or six prebid site inspections, once accompanied by a representative of the Dupont Powder Co. which was to supply the powder if plaintiff obtained the contract. Messrs. Stock and Taylor had broad experience in inspecting and working rock sources in many previous contracts and noticed nothing to indicate future trouble in obtaining suitable armor stone of the specified size, which was the largest size that either had previously had to provide. During their inspection visits they could see fractures and bedding seams in some of the rock faces if they were thick enough, but felt that the rock between stations 531–536 was sufficiently dense, massive, and free from seams to provide suitable rock. They considered the rock between stations 537–539 to be not suitable because of excessive seams and fractures. In Kaiser Industries Corp. v. United States, 340 F.2d 322, 169 Ct.Cl. 310 (1965), the court said at 325 that, as to the appearance of

a Government designated quarry to plaintiff at prebid inspection, "although geologists might debate the significance of certain visual signs in the cuts, to a reasonably competent contractor-layman these cuts gave no plain warning * * *."

Prior to bidding plaintiff was familiar with the Government plans for the project. Sheet No. 5 of the plans showed a plan view of the site for Quarry No. 1 designated as a type B source, which was a reference to the type A and B quarry sources described in FP–61, *supra*. It depicted Quarry No. 1 as lying between stations 531–539, and ranging in depth from 75 feet to 84 feet. Sheet No. 2 of the plans contained typical sections of the road, etc., for construction purposes, including a typical section through the designated quarry site describing the depth to be variable and reasonably uniform throughout the length of the quarry. A typical cross section of the road and embankment shows the latter on a 2:1 slope, with a base of quarry run rock topped by a double layer of armor stone. Sheet No. 1 of the plans contained this note: "Field investigation soils reports of the foundation materials and detailed cross sections for this project are available for inspection in the Federal Highway Projects Office * * * in Juneau * * *." The record contains no such detailed cross sections, and their contents are not known. It is not known either whether the reference to available "soils reports" meant the Materials Report, described earlier—which was useless to bidders with respect to conditions at the quarry—, or the geological analyses of samples; probably the former, or perhaps both.

At the Board hearing plaintiff's Messrs. Stock and Taylor had no specific recollection of seeing the geologic analysis reports on the Government's rock samples, nor in fact any other data available for inspection except the plans and specifications included in the invitation. They were also familiar with FP–61. They testified that they had

seen everything that the Government made available, but did not specifically recall seeing the geological analyses of samples. We do not consider they were required to evaluate the analyses, if they saw them as contradicting the Walter's January 24, 1967, memorandum. In preparing plaintiff's bid Messrs. Stock and Taylor relied on the plans, which they studied, and mostly on their visual inspections of the designated Quarry No. 1. Mr. Munson, the Government geologist corroborated the plaintiff's view that a bidder would not be able to rely on the rock sample reports for a determination of the suitability of Quarry No. 1 to produce armor stone, but would have to depend on visual inspection of the quarry site.

The plaintiff's witness, Mr. Killewich, a retired (1962) engineer who had been with the Bureau of Public Roads for 30 years and had been Mr. Walter's predecessor as Federal Projects Engineer for the Juneau District, inspected the project at plaintiff's request during performance. From his knowledge of Quarry No. 1, and of the Government's prebid information concerning it, he testified that according to his considerable experience with many prior contracts in the area involving getting rock from indigenous quarries, the plaintiff could have reasonably assumed from its survey of the designated type B quarry that it would produce acceptable armor stone in required quantities.

On the basis of the foregoing facts the Board reached the here disputed conclusion that plaintiff's prebid planning was deficient because it (1) failed to use the geological analyses of rock samples to determine the possible difficulties to be encountered, (2) ignored the waste factor completely, and (3) planned the operation as an ordinary-type project rather than one that would require a special type of handling. The greatest emphasis is placed by the Board on item (1), although the Government's geologist had advised that plaintiff could not have made a determination of the suitability of the designated quarry for armor stone production on the basis of the sample analyses, but would have to depend primarily on visual inspection of the source. The Board ignores the effect of Mr. Walter's memorandum of January 24, 1967, which states that the designated quarry should produce a 50 percent yield of armor stone, the single most important factor in the equation. Mr. Walter's yield estimate of 50 percent corresponded to plaintiff's prebid estimate, and it would be hardly fair to criticize the plaintiff for its corroborating prediction. The Government had vastly more background and reason to understand the nature of the rock and had the help of experienced geologists. The Board also relied heavily on the testimony of Mr. McCreary, defendant's heavy construction expert. Of course it is the Board's prerogative to place whatever reliance it wishes on an individual's testimony, but in doing so it must adhere to the issue. In this case, for example, Mr. McCreary stated that the unworked areas of the designated quarry at stations 537–539—which the Government's geologist and project engineer had considered the best parts of the quarry—should have led plaintiff to expect only a 10 percent yield of armor stone, and that he had never seen a quarry give more than a 25 percent yield of that substance.

The precontract consensus between the plaintiff and the project engineer as to the 50 percent potential armor stone yield of the quarry also effectively disposes of the Board's criticism of plaintiff for not having made any provision in its bid for a waste factor. If the quarry turned out to have a 50 percent yield of armor stone, as apparently both parties anticipated, the waste factor would have been minimal, for quarry run rock is produced as a byproduct of armor stone. Less tonnage of quarry run rock (60,000) than of armor stone (78,000) was required. Theoretically the byproduct should be usable with minimal waste to bother about except for certain non-rock detritus which the contract excluded from Case 2 borrow,

such as organic material, clay, silt, or other material deemed unsuitable by the project engineer. Moreover, Sheet No. 2 of the plans indicated that surplus quarry material was to be deposited in a disposal area at the base of the designated quarry face, so plans by the plaintiff for waste disposal were not necessary, an omission of which the Board took note as though it represented careless planning.

As to the third point relating to plaintiff's failure to contemplate using a special type of quarrying operation, this concerns more directly the next disputed finding by the Board that plaintiff's failure to obtain suitable armor stone from the designated quarry was due to its inadequate drilling and blasting methods, and will be discussed in connection with that issue. - While it is true that plaintiff did not anticipate the difficulties it was to encounter and expected to use customary methods of excavating rock from the quarry, that is not to say that it did not commence work prepared to meet contingencies requiring diversification of customary drilling and blasting procedures. Special methods simply consist of varying patterns for drilling, placing, and loading holes to match the peculiar requirements of the rock source, and no different equipment or supplies are entailed. As for the Board's observation that plaintiff's president was more concerned with obtaining quarry run rock than armor stone, whereas its superintendent planned to get the armor stone first and obtained quarry run rock as a manufacturing by-product, this is irrelevant. In either case the plaintiff's plan was to obtain armor stone simultaneously with getting quarry run rock, all from the same operation and the same source. There is no confusion in planning from this circumstance as the Board intimates. The fact that plaintiff's first three shots were to develop quarry run rock is entirely consistent with the plan to lay a base of quarry run rock on the embankment concurrently with an armor stone topping, the former to be somewhat in advance of the latter, so that quarry run rock was the first order of precedence at the very beginning.

The Board's findings as to deficiencies in plaintiff's prebid site inspection and planning of the project are clearly not supported by substantial evidence. Plaintiff's inspection of the designated quarry source was thorough and there was nothing more it could reasonably have done to discover in advance those quarry conditions which materialized to prevent it from obtaining required quantities of quarry run rock.

B. *Adequacy of plaintiff's drilling and blasting methods*

Article 511–2.1 of the Special Provisions of the contract required plaintiff to obtain specification armor stone "by drilling and blasting methods suitable to produce materials of the required size," and to "furnish the engineer a drilling and blasting plan prior to operations in the quarry." There is no evidence that plaintiff complied with the latter requirement, nor that any issue was made of the omission, assuming there was an omission. However, the project engineer and Government representatives were present at the job throughout its performance. At all times they were fully aware of the methods plaintiff employed and, as stated by the project engineer, he did not feel that he was authorized to order plaintiff to use any particular method since the choice of methods was the contractor's onus, although they discussed methods frequently.

The Board found that plaintiff's "method of drilling and blasting was inadequate because it lacked the type of control needed in the work under this contract." Board slip op. p. 21. It refined this holding by specifying the particular deficiencies to be (1) the use of lifters; (2) the failure to deck the holes; (3) the failure to use proper spacing; and, (4) the use of wood plugs instead of sand stemming the holes. A brief explanation of these terms is helpful.

Blasting of rock from the vertical face of a quarry involves correct placement and type of drill holes and correct method of loading the holes with explosive charges for detonation. The quality and characteristics of the rock formation, and the size of rock required, dictate the pattern of drill holes and powder charges. Basically there are two kinds of drill holes, "down-holes" and "lifter holes." Down-holes are holes drilled vertically downwards a measured distance back from the top of the quarry, at varying depths. Lifter holes are drilled horizontally into the face of the quarry, also at varying depths. At times both types are used in combination to achieve particular results. The spacing, positioning, and number of the down-holes and lifter holes are important factors controlling results. So is the method of inserting explosive charges in the holes to control the results and distribute the explosive effect of the blasting more uniformly throughout the rock formation being blasted. The powder charges should not be crammed into the bottom of the hole but should be "deckloaded," i. e., discrete quantities of the charge are distributed throughout the length of the hole at selected intervals, and are kept separated by plugs of either sand, or wood. Wood plugs can result in a more uniform distribution of the detonation throughout the deckloaded drill hole than sand plugs because the wood plugs will keep the charges separated but will not entirely fill the hole, and will theoretically permit the force of the blast to intercommunicate more evenly from charge to charge. There is no proof that the project engineer ever complained to plaintiff during contract performance over its use of wood plugs instead of sand plugs in deckloading the holes and no reason to believe that the plaintiff could not have used sand plugs as easily as wood plugs. There is in reality little significant preference. In fact, Mr. Taylor testified that plaintiff had used plugs of both kinds. There is no proof that he did not, and every reason to believe that in trying to solve the problem facing him he would use every device that he could think of. The simultaneous explosion of charges thus distributed throughout the deckloaded downholes is designed to fracture the rock in even planes by a uniform wedging action rather than shattering it, a technique which is particularly desirable when large blocks of rock are to be obtained. Conversely, lifter holes bored horizontally into the face of the quarry are designed upon detonation of deckloaded charges to shatter the rock into smaller fragments because the force of the blast is spent in breaking up of the rock formation into small pieces internally along its natural bedding seams and fracture lines rather than wedging it outwards in larger components as in the case of down-hole shots. Thus lifter shots will generally produce smaller quarry run rock, whereas down-hole shots will tend to produce large blocks of stone which can thereafter be secondarily blasted into desired shapes and sizes, all depending on the quality and geological characteristics of the particular rock source.

The Board's finding that plaintiff failed to plan and execute proper quarry production methods is premised on certain subsidiary findings that are the product of a misreading of the record. For example, the Board was convinced that the chief reason for plaintiff's failure to obtain armor stone was "the predominance of the use of the lifter method" by the plaintiff in its series of shots at both Quarries 1 and 2, particularly the former. The project engineer's weekly reports are the best evidence of the number, type, date and location of plaintiff's shots. These reports show that plaintiff detonated 10 shots at Quarry No. 1 from August 8 to September 8, 1967, of which the first three were lifter shots, one was a combination lifter and down-hole shot, and all the rest were down-hole shots except two small ones which were not made to produce rock but to bring down the fractured face of the quarry, and as to these two the weekly report does not state

whether they were down-hole or lifter shots. Later on in November 1967, after the Government had issued Change Order No. 2 which eliminated armor stones from embankment specifications, plaintiff fired two more lifter shots at Quarry No. 1, which were compatible with the smaller rock required under the change order.

As to the first three shots at Quarry No. 1 during plaintiff's first 10 days of blasting there, the reason for their being lifter shots was quite natural and defensible, for the plaintiff's initial rock requirements were for quarry run rock (Case 2 borrow) with which to raise the road grade 4 feet and to place a base on the embankment slope preparatory to topping it with armor stone. Thus plaintiff needed quarry run rock in advance of armor stone and utilized the proper blasting method to obtain it by lifter shots. The project engineer admitted that plaintiff's plan to start off quarrying operations by using lifter shots at first was announced at the preaward conference. Thereafter all of the *rock-producing* shots at Quarry No. 1 were down-hole shots except the one which was a combination lifter and down-hole pattern corresponding quite closely—so far as the weekly reports describe—to the method recommended in Mr. Walter's memorandum of January 24, 1967, as well as his later suggestion of mid-September, *infra*.

After plaintiff abandoned Quarry No. 1 as a source for armor stone [2] and moved to Quarry No. 2 between stations 406–510, it fired six shots from September 12 to October 13, 1967, of which two were lifter shots and the other four were down-hole shots. One of the two lifter shots was not so much to produce rock as to fashion a vertical rock face, presumably to prepare it for subsequent rock-producing shots. After Change Order No. 2 was issued on October 26, 1967, eliminating the need for armor stone plaintiff fired a total of six more shots at Quarry No. 2, one being a

down-hole shot, one a combination lifter and down-hole shot, four being lifter shots, and one that is not identified.

Considering all of plaintiff's shots at Quarries 1 and 2 up until Change Order No. 2 altered the rock specifications to eliminate armor stone, it is obvious from the foregoing data taken from the weekly reports that, save for the first three shots at the beginning of quarry operations, all but one of the plaintiff's *rock-producing* shots were either down-holes or combination down-holes and lifters. This is a solid refutation of the Board's finding that plaintiff's overemphasis on lifter shots was the principal cause of its inability to obtain armor stone. Apparently the Board failed to analyze the weekly reports carefully, but rested its finding on erroneous and generalized witness testimony. Both the Board and the witnesses erred in stating the number and types of shots, whereas the weekly reports are not only the best evidence of the actual count and description but they are the only reliable and accurate evidence, and are the Government's own account of what happened.

In mid-September 1967, the project engineer gave plaintiff an informal sketch of his suggested drilling and blasting pattern for Quarry No. 2. It consisted of combination down-holes and lifter holes spaced 4 feet apart at the top and face of the quarry, respectively, and prescribed the depth of holes and the deckloading pattern. The testimony, relied on in supporting the Board's finding, was that plaintiff followed the project engineer's advice as to quarrying methods after moving to Quarry No. 2 on September 12, 1967, and consequently its yield of armor stone increased dramatically. This is contrary to the facts shown in the weekly reports. In the first place plaintiff had detonated at Quarry No. 1 on August 26, 1967, a combination lifter and down-hole shot that corresponded to the project engineer's sketched suggestion given 3 weeks later, so apparently plaintiff had already

---

**2.** The parties agree that the armor stone yield at Quarry No. 1 was a disappointing 10 percent.

tried that pattern without success, perhaps at the project engineer's verbal recommendation earlier. Next, the only other combination down-hole and lifter shot used by plaintiff was at Quarry No. 2 on October 28, 1967, 2 days after Change Order 2 had eliminated the armor stone requirement. So it cannot be said as the Board stated, that plaintiff's purportedly greater success at Quarry No. 2 was due to plaintiff following the project engineer's advice to use combination shots in a certain pattern, since no such shot was used at Quarry No. 2 during any time that armor stone was the desideratum.

There is, moreover, considerable reason to doubt the Board's finding that due to following the project engineer's advice, the plaintiff's armor stone yield at Quarry No. 2 was 31.9 percent of all rock blasted. The plaintiff's testimony was that the actual armor stone yield at Quarry No. 2 was only 10 to 15 percent, for the Government informally waived strict adherence to contract size and weight specifications for armor stone and accepted an unknown quantity of armor stones of subspecification weight and size. The Board conceded the waiver, but found nevertheless that the bulk of the armor stone included in the 31.9 percent figure was of specification size and weight. The Government's 31.9 percent estimate also involves an uncertain factor of measurement of cubic yards removed from Quarry No. 2 and the conversion of that uncertain yardage into tonnage, plus a visual guess that 20 percent of the total armor stone was accepted even though it was underweight and undersize. The project engineer's monthly report for the period ending September 26, 1967, stated that Quarry No. 2 "has not provided an adequate supply of specification stone", quite contrary to the Government's present contention of a 31.9 percent yield of armor stone. The Board had nothing tangible to base its findings on, nor does the record permit an acceptable estimate, for the parties really did not know. It could have been anything from 10 to 25 percent.

At another point in its opinion the Board found that plaintiff's failure to deckload the holes contributed to its inability to obtain armor stone, a conclusion attributed to the advice of Mr. McCreary who had no first-hand knowledge of plaintiff's deckloading practices since he did not see the project until long after its completion. Plaintiff's superintendent testified repeatedly that he had deckloaded the drill holes. The project engineer agreed that plaintiff had done this but he did not think that it was properly done to provide sufficient control, in that the proper spacing of charges was not followed, although he was silent as to in what respects plaintiff's spacing was improper. Plaintiff followed the advice, *inter alia,* of the blasting expert from the Dupont Powder Co., its powder supplier, as to deckloading and spacing, and varied its procedures in an unsuccessful effort to achieve desired results. The Board's finding that the plaintiff failed to deckload its drill holes is in direct contradiction to the testimony, including that of the Government's own project engineer, and the finding as to improper spacing of the deckloaded charges finds inadequate and imprecise support in the record. The same is true as to the Board's finding of plaintiff's improper use of wood plugs instead of sand plugs for separating the charges, for reasons given before.

Mr. Taylor, the plaintiff's superintendent at the project, is experienced in quarrying rock. He has held a Federal Bureau of Mines license as a "powder man" since 1956. Throughout the performance of the contract he consulted regularly with Mr. Walter, the Government's project engineer with respect to drilling and blasting methods, and used a variety of methods to obtain armor stone, with indifferent success. Although Mr. Walter testified that plaintiff did not follow his suggestions until the operation moved to Quarry No. 2 on September 12, 1967,

Mr. Taylor said that Mr. Walter never really disagreed with plaintiff's methods, and there is no written record of any contemporaneous criticisms by the Government of plaintiff's blasting methods, either in correspondence or the Government's weekly and monthly progress reports. Mr. Walter testified that he did not mean that plaintiff used improper procedures in obtaining armor stone, but only that it did not use other available procedures.

From the foregoing it is readily apparent that there is no substantial evidence to support the Board's finding that plaintiff's inability to obtain armor stone was due to its inadequate methods of drilling and blasting. Quite the contrary picture emerges from the record, namely, that plaintiff was unsuccessful in spite of being diligent and resourceful, that the Government was sympathetic at the time and not critical until after the matter soured into litigation, and that the failure of the quarries to produce armor stone was due to their innate quality rather than a deficiency in plaintiff's methods. When faced in the *Kaiser Industries Corp.* case, *supra*, with a comparable criticism by defendant of the contractor's quarrying procedures, the court said at 340 F.2d 332, 169 Ct.Cl. 328 that "there always can be, of course, legitimate differences of opinion concerning what constitutes the best operating procedures under a given set of conditions", and observed that the Government had made no complaints at the time about the contractor's operations, which seems to be the case here.

### C. *Failure to exhaust Quarry No. 1*

■ At page 25 of its opinion the Board found as another reason for plaintiff's failure to obtain sufficient armor stone from Quarry No. 1 that it failed to exhaust the designated source. Specifically it found that plaintiff worked the quarry between stations 531–535, but not between stations 537–539 where a high ledge of rock at station 537 offered the most promising prospects, despite Government urgings.

Again this conclusion is highly debatable, and requires a determination as to whether plaintiff acted reasonably in abandoning Quarry No. 1 on September 12, 1967, and transferring with Government approval to Quarry No. 2 between stations 506–510. The plaintiff's reasons for abandoning Quarry No. 1 before its exhaustion were characterized by the Board as "wholly inadequate" when considered against the Government's evidence favoring the site. Recognizing case law that it is not necessary for a contractor to show that it was literally and physically impossible to perform the work in accordance with the contract requirements (Natus Corp. v. United States, 371 F.2d 450, 178 Ct.Cl. 1 (1967), and that difficulty, cost, and time factors can make performance practically or commercially impossible (Tombigbee Constructors v. United States, 420 F.2d 1037, 190 Ct.Cl. 615 (1970)), the Board correctly ruled that the mere prospect of hardship, inconvenience or added expense will not necessarily constitute practical or commercial impossibility. The Board did not consider that plaintiff's reasons for not exhausting Quarry No. 1 constituted proof of practical or commercial impossibility, nor prove that the unworked rock ledge at stations 537–539 was an unsuitable source for armor stone. The record must be examined to determine whether the plaintiff's conviction of futility that led to its abandonment of Quarry No. 1 was justified. It is deemed that this is primarily a question of fact, although having legal overtones.

By the time plaintiff discontinued the use of Quarry No. 1 and moved to Quarry No. 2, it had quarried principally between stations 531–535, and had not tried 537–539, particularly a ledge of rock at station 537 about 130 feet high that the Government representatives urged be tried because of its massive, uniform appearance. They considered it to be the best rock source in sight, but plaintiff declined to try the ledge because of cost due to its inaccessible height, presence of bedding seams, and

the prospect that if blasted it would fragment into unusable sizes in falling 130 feet to the quarry floor. By this time plaintiff had obtained an armor stone yield of about 10 percent from Quarry No. 1, and had encountered an extensive soft shale dike about 12 feet or 14 feet deep under the rock face which could not produce usable rock. It felt that the rock at stations 506–510 appeared to be a better and more accessible source, and so moved there with Government permission rather than try further operations on the high ledge at station 537 in Quarry No. 1 as the Government had urged. Mr. Killewich, who had been project engineer in the Juneau District for many years and was Mr. Walter's predecessor, inspected the location on October 12, 1967, and testified that from its appearance Quarry No. 1 was not a suitable source of armor stone. He estimated that it would provide an armor stone yield ratio of about 12:1, and would require the economically unfeasible removal of 900,000 tons of rock to obtain 78,000 tons of armor stone, whereas in anticipation of a 50 percent yield of armor stone plaintiff had expected to have to remove approximately 160,000 tons of rock.

Because of such prospects, its experience in encountering a deteriorated rock quality beneath the face of those parts of Quarry No. 1 it had worked between stations 531–535, the high cost and uncertainty of quarrying the high ledge of rock at station 537, and the more accessible and equally promising rock source at nearby Quarry No. 2, it is concluded that plaintiff was entirely justified in its election to abandon Quarry No. 1 without exhausting the entire location. Neither party could determine for sure whether the high rock ledge at station 537 in Quarry No. 1 would have been a superior source of armor stone, but since it was plaintiff's responsibility and it had been so disillusioned with its experience at Quarry No. 1, it cannot be criticized for moving to a different site in hopes for improvement. Moving to a different quarry is not an unusual re-

course for contractors. In Tobin Quarries v. United States, 114 Ct.Cl. 286, 84 F.Supp. 1021 (1949), the contractor moved from a Government designated quarry to another source, and then abandoned that source for a third one, managing finally to fill the contract requirement for specified sizes for rock by successive change orders which ultimately eliminated size requirements entirely, an outcome quite close to the present one where the only solution to meet the rock size requirements for the embankment was to redesign the embankment and change the rock requirement to meet what was reasonably available. And in the *Kaiser Industries Corp.* case, *supra,* the contractor moved from one Government designated quarry to another because of excessive waste encountered. It is interesting to note that in the *Tobin Quarries* case the yield of rock of originally specified size was only 30 percent, while in the *Kaiser Industries Corp.* case the waste factor was 60 percent instead of an anticipated 15–20 percent. These figures may be contrasted with plaintiff's much greater waste at Quarry No. 1, where Mr. Killewich estimated that plaintiff would have had to blast 900,000 tons of rock to get 78,000 tons of armor stone.

Thus the Board's finding that plaintiff's reasons for failing to exhaust Quarry No. 1 were "wholly inadequate" is not supported by substantial evidence but plaintiff's reasons were justified, prudent, and entirely consistent with the contract responsibility and authority for plaintiff to select its rock sources, subject to Government approval.

### D. *Changed Conditions*

At p. 25 of its decision the Board concluded that plaintiff "has failed to prove the existence of a changed condition in the listed source [*i. e.,* Quarry No. 1]."

Article 4, the standard construction contract clause on Changed Conditions, offers two bases for an equitable adjustment:

(a) subsurface or latent physical conditions at the site differing mate-

rially from those indicated in this contract, or

(b) unknown physical conditions at the site of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in this contract.

Plaintiff's claim is primarily under (a), and only secondarily under (b). Our treatment is confined to (a).

■ At the outset plaintiff maintains, without formal demur by defendant, that the Board decision on the changed conditions issue was a legal decision—contract interpretation—and therefore not enjoying finality under the Wunderlich Act, citing cases. Whenever the court has encountered this malleable fact-*cum*-law fiction in category (a) changed conditions issues it has almost invariably considered that resolving the indications in a contract requires interpretation and construction of the contract, hence a judge's job more than a fact-finder's, and thus a matter of law for the tribunal rather than a matter of fact for Board expertise. Ray D. Bolander Co. v. United States, 186 Ct.Cl. 398, 405, 415–416 (1968); Foster Constr. C. A. v. United States, 435 F.2d 873, 880, 193 Ct.Cl. 586, 601–602 (1970); Kaiser Industries Corp. v. United States, 340 F.2d 322, 333–334, 169 Ct.Cl. 310, 330 (1965); Vann v. United States, 420 F. 2d 968, 981–982, 190 Ct.Cl. 546, 569–572 (1970). Other courts share this view. United States v. Johnson, 153 F.2d 846, 849–850 (9th Cir. 1946). More vapors than nourishment would be gained from further paddling this dialectic broth. *Cf.* Ray D. Bolander Co. v. United States, *supra*, 186 Ct.Cl. at 405, 415. Suffice it to say that the Board decision under review is, as to the issue of changed conditions, as much one of law as in the distinguished precedents cited and thus is not to be endowed with finality. The flavor of law dominates the smell of fact.

■ What were the contract "indications" as to the suitability of Quarry No. 1? They need not be explicit or specific, but only enough to impress or lull a reasonable bidder. Foster Constr. C. A. v. United States, *supra*, 435 F.2d 873, 193 Ct.Cl. 586, at 593. It has been demonstrated that plaintiff made a thorough site investigation of the designated quarry prior to bidding, that it considered those contract documents shedding light on the rock prospects (drawings, specifications, and presumably the project engineer's memorandum of January 24, 1967, predicting a 50 percent armor stone yield), and that it thinks it must have seen but cannot precisely remember having seen the geological analyses of rock samples that had they been seen would have in part been technically unintelligible [3] and in other part confirmatory of plaintiff's visual appraisal that the designated quarry contained largely suitable rock. These are all contract "indications" that Quarry No. 1 would supply the project adequately with rock. To these must be added an important one that by designing an embankment requiring certain sizes and types of stone and then selecting a quarry source for their production the Government conveyed its belief that the source would be adequate. *Cf.* United States v. Johnson, *supra*, 153 F.2d at 849. For a discussion of the difference between this kind of a representation and the formal doctrine of misrepresentation, see Foster Constr. C. A. v. United States, *supra*, 435 F.2d 873, 193 Ct.Cl. 586 at 602–604. Thus the visible or ascertainable conditions of Quarry No. 1 were apparently not sufficient to deter either the Government from designating it as a suitable though not guaranteed source of specification rock, nor the plaintiff from endorsing the Government's assay to the extent of risking a bid. Sauce for the Government should be nothing less for the bidder. As the court said in Foster Constr. C. A. v. United States, *supra*, 435 F.2d at 896,

---

3. *Cf.* Foster Constr. C.A. v. United States, supra, 435 F.2d 873, 193 Ct.Cl. 586, at 612–613.

193 Ct.Cl. at 629, "The exposed rock was as visible to the designer [the Government] as to plaintiff."

The caveatory language in the incorporated provision of FP–61 in which the Government ritually disclaims responsibility for the designated type B quarry and places the risk on the contractor does not dilute the representation that the Government considers the designated quarry as suitable, for it would assuredly not recommend one that it thought unsuitable. The caveat of FP–61 could mean to bidders only that the type B quarry recommended was not as foolproof as a guaranteed type A quarry, and would not amend, diminish, or affect the contractor's rights under the Changed Conditions clause. This is conceded by all, as indeed it must be since Kaiser Industries Corp. v. United States, *supra,* 340 F.2d at 329–330, 169 Ct.Cl. at 323–324, and Morrison-Knudsen Co. v. United States, 397 F.2d 826, 829, 841–842, 184 Ct.Cl. 661, 666, 685–686 (1968). The principle has since been ratified. Foster Constr. C. A. v. United States, *supra,* 435 F.2d 873, 193 Ct.Cl. at 616, and n. 1 at p. 595.

In retrospect it is obvious that the parties were mutually mistaken, the Government in designing the embankment around a non-available source of rock, and both parties in thinking that the designated quarry was suitable to do the job. Compare Kaiser Industries v. United States, *supra,* 340 F.2d 322, 169 Ct.Cl. at 325; and Tobin Quarries v. United States, *supra,* 84 F.Supp. 1021, 114 Ct.Cl. at 333. Neither can be blamed for not anticipating the inner realities lying behind the smiling face of the selected quarry site, but the plaintiff less than the Government. The latter had better reason to appreciate the significance of the geological characteristics of the rock disclosed in the samples, greater knowledge of the terrestrial quirks of the vicinage from the studies made by or for the Government and not offered or readily available to plaintiff, and superior exposure to the practical material potential of Douglas Island derived from its experience in designing and supervising the preceding and ongoing road construction contract. The Government could have but did not—as it sometimes does—take the precaution of making core borings at the selected quarry to unlock nature's secrets, and of course a bidder would not do so for obvious reasons of cost and time. Foster Constr. C. A. v. United States, *supra,* 435 F.2d 873, 193 Ct.Cl. at 616. After all, the contract in suit was comparatively small and would not justify too much preparatory planning cost by the Government. In a larger contract, for example, the Government made core borings of a designated quarry, and despite this the contractor encountered difficulties in obtaining specification rock and was excused. Kaiser Industries v. United States, *supra,* 340 F.2d 322, 169 Ct.Cl. at 321. The Government customarily relies on the Changed Conditions clause to remove unknown risks from competitive bidding and to obtain favorable bid prices stripped of such risk factors. Such a procurement policy benefits the Government by keeping costs down, and benefits bidders by compensating them by formula for overcoming subsurface conditions not anticipated in their bid estimates and suggested neither in available data nor by site inspection. See discussion of purposes of the Changed Conditions clause in Foster Constr. C. A. v. United States, *supra,* 435 F.2d 873, 193 Ct.Cl. at 613–615, and Kaiser Industries v. United States, *supra,* 340 F.2d 322, 169 Ct.Cl. at 323.

The Government's willingness to redesign the embankment so as to eliminate the hard-to-get armor stone and make it possible to use available rock and at the same time provide adequate protection is tacitly shown by Change Order 2 issued on October 26, 1967, and by the granting of a 75 day time extension to plaintiff when it ran out of good weather at the onset of winter months. While the change order explained that it was issued "In the interest of expediting completion of the contract so as to avoid possible late fall storm damage to the

unprotected project", the reason was also described as being "Due to difficulties in procuring armor stones", and the contracting officer stated that the design change would enable plaintiff to use a "substantial amount of undersize stones which result from numerous existing bedding seams in the quarry formation." Altogether the change order can be interpreted as a concession by the Government of the inadequacy of the quarry sources to produce armor stones of the type required under the superseded specifications. The effect of a change order under similar conditions was commented on 435 F.2d 873, 193 Ct. Cl. at 624 of Foster Constr. C. A. v. United States, *supra*. This interpretation is enhanced by a complete lack of contemporaneous written criticism of plaintiff's quarrying methods in either the weekly and monthly reports or in correspondence,[4] plus the granting of a time extension which usually establishes at least a lack of negligence or fault on the contractor's part.

