Plaintiff in this case seeks direct access review of a contracting officer’s decision under the provisions of the Contract Disputes Act of 1978. The case is before us on defendant’s motion for summary judgment. Plaintiff opposes the motion on the grounds that genuine issues of material fact remain and that defendant is not entitled to judgment as a matter of law. We grant defendant’s motion for summary judgment.
As is usual in this kind of case, plaintiff seeks relief both off and on the contract. Off the contract, plaintiff alleges that defendant has breached the contract on two theories. First, plaintiff claims that the Government fraudulently misrepresented the quantity of acceptable rock in a quarry that the Government had approved as a source for rock for the project herein. Second, plaintiff claims that the Government had superior knowledge of the quantity of acceptable rock, which it had a duty to disclose to plaintiff but did not. On the contract, plaintiff claims entitlement to an equitable adjustment based on the Differing Site Conditions clause of the contract for the unexpectedly small quantity of acceptable rock in the quarry. We will discuss these three issues in the foregoing order.
Before reciting the facts, we note our conclusion that there are no genuine issues of material fact in the record which would, in themselves, preclude summary judgment. While the inferences and conclusions drawn from the facts *1014 by the parties differ radically at times, the underlying material facts are not in genuine dispute.
In early 1978, the Soil Conservation Service (scs) of the Department of Agriculture began planning the construction of emergency streambank restoration on the Aravaipa Creek in Arizona. As set out in the invitation for bids (ifb), the contract, and the specifications, the basic design of this project involved a compacted earth fill core, with rock facing — called "riprap” — to prevent erosion. The specification for the riprap[1] read, in pertinent part:
2. MATERIALS
Individual rock fragments shall be dense, sound and free from cracks, seams and other defects conducive to accelerated weathering. The rock fragments shall be angular to subrounded in shape. The least dimension of each individual rock fragment shall be not less than one-third the greatest dimension of the fragment.
Rock from the designated sources, or from other sources approved by the Engineer[,] shall be excavated, selected, and handled as necessary to meet the grading requirements in Section 8 of the specification or on the drawing. * * *
The specification addresses the characteristics of riprap. First, it describes the quality of the rock itself. This aspect of riprap is discussed at some length in the scs National Engineering Handbook, cited by plaintiff, where the "quality” of rock is described ¿s its soundness and durability. Second, the specification describes the size, or grading, of the rock used for riprap. The approval requirement in section 8 — "The suitability of the rock for riprap shall be approved by the Engineer * * *” — refers to these characteristics.
Besides its characteristics, the other issue concerning the riprap is its source. There are only two references to source in the contract. The first is Special Provision 2(a):
Unless otherwise specified in this contract the Contractor shall furnish all materials required for the completion of the contract.
The second is in the specification, quoted above: "the designated sources, or * * * other sources approved by the *1015 Engineer.” In the absence of any other contract provisions relating to source, we must conclude that there is no "designated source” of rock, that the contractor is free to find and use any source, that it is the contractor’s duty to find a source, and that the source chosen by the contractor is to be approved by the Government with respect to the quality and grading of the rock derived therefrom.
On November 17, 1978, as part of the preparation for the project, Aubrey C. Sanders, Jr., an experienced Government geologist, made a field trip to one potential local source of riprap, the Lackner quarry, for the purpose of determining whether there was any local source of riprap. Unless some source existed, regardless of its commercial attractiveness, the project could not be undertaken at all. The Lackner quarry was close to the project site, but it was neither owned, operated, nor used by the Government.
Mr. Sanders stayed at the quarry for about one and a half hours and produced a report (dated November 27, 1978) in which he stated that the rock was of sufficient quality but expressed some reservations about the particular source. Noting that the rock was extensively fissured and jointed, he was concerned that there could be "some problem relative to excessive breakdown of the rock, thereby yielding an excessive quantity of undersized materials.” He concluded that, all told, the quarry would provide a sufficient quantity of rock of the appropriate grading, but he cautioned that "a determination to use this source should be contingent upon the results of * * * test quarrying to evaluate the breakdown characteristics of the rock.”[2] The report was not made available to prospective bidders.
On March 16, 1979, the ifb was issued. It contained the contract provisions discussed above and announced that tours of the site would be conducted. Pursuant to this notice, an employee of plaintiff, L. G. Everist, who was not a geologist, participated in a site tour on April 4, 1979, led by Bob Kilcrease, the scs Area Engineer. Mr. Everist (along *1016 with others) was taken to the construction site and then to the Lackner quarry. Mr. Kilcrease told the group that the Lackner quarry was an approved source. According to his testimony, Mr. Everist took this to mean that there was a sufficient quantity of rock of adequate quality to satisfy the requirements of the contract. Mr. Kilcrease also made it clear that the Government did not own the quarry and that bidders would have to strike their own bargain with Lackner. Mr. Everist left the tour with the impression that the Government expected that the Lackner quarry would be used because of its proximity, but that bidders were free to use another quarry, so long as its rock was approved.
A few days later, on April 9, 1979, Mr. Everist again toured the quarry, this time with George Spencer, another employee of plaintiff. Mr. Spencer was not a geologist but he had had 30 years of experience in evaluating potential quarry sites for plaintiff. Mr. Spencer flew over Lackner and another potential local source, the Grand Reef Mine, and he toured Lackner on foot. He was aware that Lackner was approved for quality and understood that his task was to decide whether it was also economical. From the record it is clear that Mr. Spencer made virtually the same observations as Mr. Sanders did, but Mr. Spencer conducted no laboratory tests and did not consider test quarrying due to the small size of the project. He concluded that the Lackner quarry should be used and recommended it to his superior.
Plaintiff submitted its bid on April 11, 1979, and was awarded the contract on May 2, 1979. The contract, as stated in the ifb, contained a Differing Site Conditions clause; it required approval of any choice of rock; it neither designated nor mentioned any quarry; and it required the contractor to be responsible for supplying the materials for construction.
Shortly after commencing quarrying operations, the tendency of the Lackner rock to break excessively into small pieces became apparent. The waste rate was running at about 50 percent, far higher than expected. There is no dispute that the high waste rate slowed production and increased costs to plaintiff. There is also no dispute that an *1017 adequate quantity of riprap was eventually obtained from the Lackner quarry.[3] The contracting officer denied plaintiff relief in a decision of September 11, 1980, and plaintiff promptly filed its petition in this court on October 21,1980.
We first consider plaintiffs two breach of contract claims — (1) misrepresentation and (2) superior knowledge— and then consider (3) the equitable adjustment claim.
1. Plaintiffs claim of misrepresentation is founded upon the contrast it draws between Mr. Sander’s reservations about the breakdown size of the rock in the Lockner quarry and the statements of Mr. Kilcrease that the quarry was an approved source of rock. The obvious difficulty with this theory is the distinction, clearly drawn by the contract, the specifications, Mr. Sanders, and Mr. Kilcrease — and clearly understood by Messrs. Everist and Spencer — between the required physical characteristics of the riprap (quality and grading) and the commercial requirements for the source of the riprap. The short of the matter is that Mr. Sanders expressed some hesitancy about the amount of waste that might be involved, but Mr. Kilcrease made no representations in that respect at all.[4] Mr. Kilcrease said, and was only understood to say, that the quality of rock was approved and that an adequate quantity of it was available at Lackner. Plaintiff has alleged no facts which would indicate that Mr. Kilcrease suggested in any way what the cost of the quarrying would be.
Nor should we expect that such representations were made. Bidders were encouraged to visit the project site and to note sources of materials, and part of the calculation of the bid price must have been the estimated cost of acquiring the required amount of riprap from whatever source and by whatever means chosen. This was the whole point of Mr. Spencer’s visit to the area. He visited the Lackner quarry and the Grand Reef Mine and flew over the whole area for *1018 the purpose of recommending the most commercially attractive quarry. Having been told only that the Government approved the Lackner rock for quality and quantity, he chose Lackner as the most economical.
Plaintiffs claim of misrepresentation must fail because the Government made no erroneous representation material to the problem — excessive waste — upon which plaintiff bases its suit, nor did plaintiffs representatives understand that any such representation was made.
2. Plaintiffs superior knowledge claim must also fail on the threshold issue: we cannot find from the record or from plaintiffs factual allegations that the Government had superior knowledge not reasonably available to plaintiff. Rather than entering into a detailed discussion of the factors set out in Helene Curtis Industries v. United States, 160 Ct. Cl. 437, 443—44, 312 F.2d 774, 778 (1963), and H. N. Bailey & Assocs. v. United States, 196 Ct. Cl. 166, 177—78, 449 F.2d 376, 382—83 (1971), in this case we are presented with a straightforward comparison of available information.
Mr. Spencer, while not a trained geologist, had a great deal of experience in precisely the task before him. His testimony and his longevity in his post demonstrates that he was qualified for the task. Both he and Mr. Sanders inspected the quarry on foot; Mr. Spencer also examined it from the air. The observations of the two were nearly identical and both were aware of the potential significance of the extensive jointing and Assuring of the rock. Mr. Spencer testified:
Q: [by Government counsel] Did you consider whether these natural joints and fractures might cause [exc]essive breakage when the placing was done?
*****
A: I decided they would not. [Emphasis supplied.]
The only real difference between their reports was their conclusions,[5] and then only in that Mr. Sanders was *1019 inclined to be cautious about the breakage rate and Mr. Spencer was not. While Mr. Sanders would have test quarried before using Lackner, Mr. Spencer, who was actually deciding whether to use it, testified:
Q: [by Government counsel] Did you consider doing some test quarrying?
A: No, ma’am.
* * * * *
Not on a job this size.
Q: Because it is too small?
A: That is correct.
We conclude that the parties’ knowledge was based upon data equally available to both and that, while more conclusive data was available, neither party chose to obtain it. In these circumstances, there is no duty imposed upon the Government to disclose its information to plaintiff. T. F. Scholes, Inc. v. United States, 174 Ct. Cl. 1215, 1226, 357 F.2d 963, 970 (1966).
3. Finally, plaintiffs claim on the contract for an equitable adjustment under the Differing Site Conditions clause must fail because the excessive waste spoilage at the Lackner quarry was not a site condition to which the clause applied. This Differing Site Conditions clause reads, in pertinent part
(a) The Contractor shall promptly * * * notify the Contracting Officer in writing of: (1) Subsurface or latent physical conditions at the site differing materially from those indicated in this contract, or (2) unknown physical conditions at the site, of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in this contract. * * * [Emphasis supplied.]
Our discussion of the terms of the contract should amply demonstrate that the Lackner quarry was not "the site” within the meaning of the contract. The Lackner quarry was not designated or even mentioned by the contract; furthermore, the contract made plaintiff solely responsible for the acquisition of riprap. The Lackner quarry was "at the site” only in the sense that plaintiff used it, not within the contemplation of the contract.[6]
*1020 This does not entirely conclude our inquiry, however, for this court has consistently given the Differing Site Conditions clause a broad scope to effectuate it fully. Kaiser Industries Corp. v. United States, 169 Ct. Cl. 310, 323-24, 340 F.2d 322, 329-30 (1965); Morrison-Knudsen Co. v. United States, 184 Ct. Cl. 661, 666, 397 F.2d 826, 829 (1968); Stock & Grove, Inc. v. United States, 204 Ct.Cl. 103, 134-35, 493 F.2d 629, 646 (1974). Plaintiff argues, based on the Kaiser doctrine that the Government cannot disclaim all responsibility for conditions which, while nominally not covered by the contract’s terms, are necessarily part of the contractor’s performance. Kaiser Industries, 169 Ct. Cl. at 323-24, 340 F.2d at 329-30. Stated thus, Kaiser states a doctrine which we wholeheartedly endorse. On the other hand, it should not be expanded to subvert the meaning of the contract.
The question for us is whether the use of the Lackner quarry was necessarily so bound up with the contractor’s performance that the Government should be responsible for the conditions at the quarry. Examining the case, we find two particularly significant factors: the first and most important is the extent to which the contract (and accompanying drawings or specifications) or circumstances anticipate the use of a particular quarry; the second is the size of the difference between anticipated or represented conditions and the actual conditions.
In Tobin Quarries, Inc. v. United States, 114 Ct. Cl. 286, 84 F. Supp. 1021 (1949), the contract required the contractor to quarry its rock from Moose Creek Butte, which the Government represented to be "'a solid rock formation.’” Id. at 331-32, 84 F. Supp. at 1021. In that case, however, there was an extreme amount of waste, stated by the contractor to be 10 to 1 and 3 to 1, waste to suitable rock, in various locations. Id. at 301, 304, 332, 84 F. Supp. at 1021-22.
The facts in Kaiser were more extreme, which may account for its broadly worded holding. In that case, the
*1021 Government owned two local quarries which, after years of investigation, it had found to be the only ones in the area. Kaiser Industries, 169 Ct. Cl. at 314, 340 F.2d at 324. The contract itself stated that the quarries were "approved”— the Government had conducted extensive investigation of the quarries — and could be used without charge. Id. at 314, 321-22, 340 F.2d at 324, 328-29. Indeed, the way the bidding was set up, the Government in effect allocated a particular quarry to the contractor. Id. at 319, 340 F.2d at 327. The quarry first used was "not a commercially operable one at all.” It yielded 60 percent waste and was exhausted of all usable material long before producing the amount required by the contract. Id. at 314-15, 340 F.2d at 324-25.
Morrison-Knudsen also differs significantly from the instant case. That contract not only designated borrow pits, but it and the 98 accompanying drawings described their location, section, relation to the project, and capacity in great detail. Morrison-Knudsen, 184 Ct. Cl at 672-73, 397 F.2d at 833. The proposal also included for the bidders’ perusal field studies and material studies of the pits. Id. at 672, 397 F.2d at 833. As in Kaiser, the pits failed even to supply the quantity of material required by the contract— contrary to express representations — and all of the material from some of them was rejected by the Government for its low quality. Id. at 674, 379 F.2d at 834.
Finally, in Stock & Grove, the court was again presented with a contract that designated a specific site as the quarry and required the contractor to quarry there. Stock & Grove, 204 Ct. Cl. at 107, 110, 493 F.2d at 630, 632. And despite the Government’s implicit representations of quantity and quality, Id. at 107-08, 493 F.2d at 630, the contractor could not complete the contract without more material from a new quarry and relaxed quality requirements. Id.
Without again rehearsing the facts of the instant case it should be apparent that the Lackner quarry was by no means as close to the present contract as the quarries in the cited cases. Neither the contract here, nor any of its attachments, made any reference to Lackner and, as represented, Lackner supplied a fully sufficient quantity and quality of rock for the project. It supplied the rock at a *1022 higher cost than anticipated, but, in the circumstances, that one fact cannot bring this case within the ambit of the Kaiser doctrine.
it is therefore ordered, after thorough consideration of the parties’ submissions and without oral argument, that defendant’s motion for summary judgment is granted and the petition is dismissed.

 The Government used Specification No. 216-8 — Rock Riprap, instead of the more rigorous Nos. 61 — Loose Rock Riprap and 523 — Rock for Riprap, because this project was designated an emergency project pursuant to 7 C.F.R. §§ 624.1-624.9 (1982). Of course, only the provisions of Specification No. 216-8 are relevant here.

 Mr. Sanders also recommended laboratory tests, but it is clear that such tests related solely to the quality of the rock. These tests were conducted with satisfactory results.
The Government did not conduct any test quarrying because, from its point of view, the purpose of the preparatory work was only to ensure that a source of riprap existed, not necessarily an economical source.

 The quarry consisted of two steep slopes facing each other across a creek. The primary location was the northern slope; however, Mr. Sanders noted in his first report that the southern slope could be used if inadequate quantities were found at the primary slope. Plaintiff did have to resort to the southern slope.

 It is instructive to compare this case with Tobin Quarries, Inc. v. United States, 114 Ct. Cl. 286, 333, 84 F. Supp. 1021, 1022 (1949). There the court found that a misrepresentation, albeit innocent, had occurred because in designating in the contract a particular site for the quarry the Government implicitly represented that it was economical. Here, by contrast, no designation was made.

 Plaintiff makes much of Mr. Sander’s statement, upon a return visit to Lackner after plaintiff began to experience difficulties, that "[t]he degree of breakdown, however, is not unexpected as indicated by my trip report dated November 27,1978.” (Emphasis supplied.) The post hoc double negative cannot be relied upon as evidence that Mr. Sanders knew that there would be a high degree of breakdown. Indeed, his earlier suggestion of test quarrying shows that he was in doubt prior to the bidding.

 To test the validity of this proposition, one might consider the consequences of plaintiffs choosing the Grand Reef Mine instead of the Lackner quarry. Not one word of the contract or specifications would have changed, yet surely it is clear that if *1020 plaintiff had chosen Grand Reef, all other facts remaining the same, plaintiff would have no action against the Government. It only remains to be noted that plaintiff clearly considered such an action in visiting Grand Reef Mine and in making an aerial survey of the entire area.