DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Appeals of - | ) | |
| | ) | |
| Shoreline Foundation, Inc. | ) | ASBCA Nos. 62876, 63616 |
| | ) | |
| Under Contract No. W912EP-16-C-0027 | ) | |

APPEARANCES FOR THE APPELLANT: Robert G. Barbour, Esq.
Matthew D. Baker, Esq.
Watt, Tieder, Hoffar & Fitzgerald L.L.P.
McLean, VA

APPEARANCES FOR THE GOVERNMENT: Michael P. Goodman, Esq.
Engineer Chief Trial Attorney
Amber R. Jackson, Esq.
Bruce E. Groover, Esq.
Susan E. Symanski, Esq.
Kristin M. Bigham, Esq.
Engineer Trial Attorneys
U.S. Army Engineer District, Jacksonville

OPINION BY ADMINISTRATIVE JUDGE O'CONNELL ON
RESPONDENT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Respondent, the United States Army Corps of Engineers (USACE), has filed a motion for partial summary judgment in No. 62876. The Board held oral argument on the motion and grants the motion with respect to appellant's defective specifications theory but denies it with respect to superior knowledge. The Board issued a previous decision striking allegations of impacts and/or delays regarding a 2016 bid protest from the complaint filed in ASBCA No. 63616. *Shoreline Foundation, Inc.*, ASBCA Nos. 62876, 63616, 23-1 BCA ¶ 38,468. Familiarity with that decision is presumed.

STATEMENT OF FACTS (SOF) FOR PURPOSES OF THE MOTION

In support of its motion USACE has filed a statement of undisputed material facts (GSUMF). Appellant has filed a statement of genuine issues precluding summary judgment (ASGI). The following facts are undisputed or uncontroverted.

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

A Brief Summary of Contract Requirements

1. USACE issued the solicitation for the above-captioned contract (Hurricane and Storm Damage Reduction Project, Brevard County, Florida, Mid-Reach Segment - Mitigation Feature) on August 9, 2016. Bids were due on September 26, 2016. (R4, tab 1 at 1-2, 745[1]) USACE held a pre-bid site visit on August 18, 2016, that appellant, Shoreline Foundation, Inc. (SFI), attended (R4, tab 1 at 635[2]).

2. On September 29, 2016, USACE awarded the contract to SFI, which is based in Florida (compl. ¶¶ 1, 15). The original value of the contract was $13,236,255.08 (R4, tab 55 at 2, 4). The contract required completion within 730 days after issuance of the notice to proceed (R4, tab 1 at 73).

3. The contract required SFI to manufacture, transport, and install concrete mats with coquina rock surfaces to establish a 4.8-acre artificial reef off the coast of Brevard County, Florida, in water depths of 14 to 16 feet, 1,000 feet from shore, in an area referred to as the Mid-Reach (R4, tab 1 at 208-09). The primary component of the contract price was a lump sum of $7,650 per reef mat (R4, tab 55 at 4).

4. A reef block, per the contract, is an individual 2.6 feet by 2.6 feet by 1-foot-high piece of concrete/coquina. A reef mat is 18 reef blocks connected by lateral and longitudinal cables in a three by six block pattern. A reef set is 45 reef mats. The project included 36 reef sets with three to four reef sets placed in proximity to one another at 10 reef sites. (R4, tab 1 at 208-09).

5. An SFI supplier manufactured the mats and SFI brought them to the site by barge (ASGI[3] ¶¶ 11, 45, 117). The contract required SFI to lower the reef mats to the bottom and place them in the specified position no more than 12 inches from adjacent reef mats. The contract prohibited dropping the reef mats through the water or pushing or pulling them after they were in contact with the floor or geotextile. (R4, tab 1 at 440, 445).

6. SFI alleges that it bid the project based upon its belief that it would be able to work at the project site in wave heights up to four feet (app. opp'n at 4).

---

[1] R4, tab 1 is the solicitation, to which we will cite in this opinion. Tab 55 is the contract signed by the contracting officer. The contract incorporated the solicitation (R4, tab 55 at 2).

[2] R4 cites are to the .pdf page number of the electronic file.

[3] Citations to ASGI mean that the government in its reply brief did not dispute the cited fact.

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

USACE Knowledge Concerning Site Conditions

7. Prior to issuing the solicitation, USACE studied the feasibility of the project and had accumulated years of research related to conditions at the project site (ASGI ¶ 3). As described below, SFI contends that conditions at the site were more difficult than it expected and that the season in which it could place the mats was shorter than the contract indicated. One of the key issues in dispute is the significance of information that USACE possessed but did not disclose in the solicitation.

8. USACE prepared a design document report (DDR) dated September 11, 2015 (ASGI ¶ 35; ASGI, ex. B). The DDR stated that it had been prepared by the Engineering Team Lead to provide "a technical record for the mitigation reef feature for Brevard County . . ." (ASGI, ex. B at 11). The DDR stated that Brevard County was the sponsor of the project and that both the County and its coastal engineering consultant, Dr. Kevin Bodge of Olsen and Associates, Inc. (Olsen), were actively involved with USACE in the project development team (ASGI, ex. B at 8). Olsen is a coastal engineering firm that "specializes in the study, design, permitting, and management of projects located in coastal and estuarine environments . . ." (ASGI ¶ 38).

9. The DDR cited three reports attributed to Olsen issued in 2005, 2007, and 2016, and three reports attributed to Dr. Bodge dated between 2013 and 2015 (ASGI, ex. B at 22). These reports included a document prepared by the Olsen firm in 2007 entitled "Practical Consideration of Depth for the Construction of Nearshore Mitigation along the Mid Reach Coastline of Brevard County, Florida" (*id.*) (Olsen 2007). The DDR repeatedly cited Olsen 2007 (ASGI, ex. B at 9, 22-23, 29-31, 33). Among other things, the DDR stated that Olsen 2007 "provided the principal physical characteristics at the reef placement sites" (*id.* at 23).

10. Olsen 2007 stated that "[t]he wave climate along the Mid Reach was considered through fifty years of six-hour hindcast wave data (July 1954-June 2004), developed in water depth of about -20 ft (NGVD), offshore of about R-106, as prepared for the Corps of Engineers" (ASGI, ex. H at 392 (footnote omitted)). Olsen purchased at least some of the data used to perform the analysis from Dr. William Dally (the "Dally Data") for $1,600 in 2006[4] (ASGI, ex. K at 2-3). Olsen completed its report over 10 months after it received the Dally Data (ASGI ¶ 44).

---

[4] During oral argument, the Board asked for clarification of the term "six-hour hindcast wave data." SFI filed a supplemental brief, but the explication is too complicated to restate here. Basically, SFI contends that Dr. Dally took a wave model developed by USACE and improved it. Dr. Dally used his improved version of the model to take data from a deepwater area to project conditions in the nearshore area where the

3

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

11. The Olsen 2007 report contains several statements that indicate difficult site conditions. Among other things, Olsen 2007 described the site as having "chronically limited, near-zero underwater visibility" (ASGI, ex. H at 391).

12. The Olsen 2007 report stated that the maximum wave heights in which a contractor could work would be 2-feet or less and that work in 3-foot seas was "mostly infeasible" (*id.* at 392). It stated that "significant wave heights" of 2-feet or less occurred on average only 25% of the year (*id.* at 394). The period from June to August was the most consistently calm with significant wave heights of 2-feet or less between 33% and 48% of the time. Olsen then opined "[t]he marine construction window for a reef construction project of this scale, offshore of the Mid-Reach, is pragmatically limited to between mid-May and mid-September." (*Id.*) Olsen also observed that June and July are the only months in which the site experiences, on average, at least one four-day stretch of "calm seas" (*id.* at 398). But the report stated that "some years exhibit few or no periods of calm seas, including June – August" (*id.* at 394).

13. However, Olsen 2007 contained one statement opining that the conditions in the Mid-Reach were well known:

> The general area – from Cocoa Beach through Satellite Beach and Indialantic -- is well known for its consistent, high swell. It is not coincidental that multi-time world surfing champions Kelly Slater, Lisa Anderson, and others, grew up surfing in this area.

(ASGI, ex. H at 391)

14. USACE did not include Olsen 2007 as part of the solicitation, nor did it provide it to SFI (ASGI ¶¶ 52-53). USACE did not provide the DDR to SFI (gov't supp. Br. at 2).

15. The DDR also cited a 2013 memorandum from Dr. Bodge regarding "Mid Reach Reef Mitigation Design" (ASGI, ex. B at 22). This memorandum contemplates construction from May to August but adds that if construction continued past mid-September additional costs should be added to the price. (ASGI, ex. O at 6). USACE did not provide the 2013 Bodge memorandum to SFI prior to bid (ASGI ¶ 58).

---

work was performed. SFI states that the Dally Data contains an entry every six hours for 50 years. (App. first supp. br. at 2-3)

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

16.  USACE relied on Olsen 2007 when it performed its cost estimating for the project (ASGI ¶¶ 61-62).  USACE based its cost estimate for the project, in part, on the assumption that "construction would only be practical when seas are less than 3 feet and ideally less than 2 feet" (ASGI, ex. N at 10, no. 22).  The USACE estimate stated that "weather conditions are most favorable for placement during the months of May through August" (ASGI, ex. T at 18).

Contract Provisions Defining the Work Season

17.  Contract section 35 32 30 (Articulated Concrete – Coquina Embedded Reef Mats), paragraph 1.3.6, Placement Season, provided:

> A placement season will be defined on the Contractor's
> project schedule as to when seasonal weather patterns that[5]
> will allow placement operations at selected reef sites.  **It is
> anticipated that the placement season may occur between
> April 1st and October 1st.**  Reef Mat placement will be over
> two seasons where the Contractor shall successfully place 4 to
> 5 reef sites in the first placement season and place the
> remaining 5 to 6 reef sites in the second season.

(R4, tab 1 at 726 (emphasis by SFI (ASGI ¶ 17))).  Accordingly, the contract speaks of a placement season longer than that contained in Olsen 2007 or the time period USACE referenced in its cost estimate (SOF ¶¶ 12, 16).

18.  Neither party contends that sea and weather conditions would have allowed for the placement of mats from late-fall to early spring.  In fact, this same contract section, in the Project Order of Work paragraph, states "the area where placement sites are located experience [sic] inclement weather which typically occurs between November 1st and May 1st" (R4, tab 1 at 730).  Accordingly, April is identified as both the last month of the inclement weather season and the first month of the placement season.

---

[5] The original solicitation did not contain the word "that" in this sentence.  It was added in Amendment 5 (*compare* R4, tab 1 at 424 (original solicitation), *with* R4, tab 1 at 726 (Amendment 5)).  We see no plausible explanation for the addition of "that" other than that it was a mistake.  It does not change our interpretation of the sentence or the contract.

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

Contract Provisions Requiring SFI To Evaluate Weather Conditions

19.  Contract section 01 11 00, Summary of Work, at 1.9.1, provided that "[t]he project area may be affected by stormy, windy and/or rainy weather, including thunderstorms, during any time of the year" (R4, tab 1 at 212).  It provided that the "Contractor shall be responsible for obtaining information concerning rain, wind and wave conditions that could influence safety, dredging and disposal operations prior to submitting a proposal or bid" (*id.*).

20.  Contract section 00 33 50 (Weather and Water Stage Data) provided:

> Weather Conditions.  The project area is subject to tropical storms and hurricanes from June through November, and to windy and/or rainy weather during any time of the year. . . . The wet season in the project area is from May through October. Rainfall during these months is closely associated with convective activity. These rainfall events are normally of short duration and amounts are spatially variable. . . . Dangerous thunderstorms can occur in this area at any time of the year.
>
> It shall be the contractor's responsibility to obtain information concerning weather conditions in the project area.

(R4, tab 1 at 203, 206)  This section also stated that the site was subject to storm surges during the entire year (*id.* at 204).

21.  Section 35 32 30 (Articulated Concrete – Coquina Embedded Reef Mats), at paragraph 1.5.4, Working Environment, contained another warning that it was up to the contractor to determine the impact of environmental conditions on the work: "[t]he Contractor shall ascertain the environmental conditions which can affect water and land access, such as climate, terrain, winds, current, waves, swells, depths, shoaling, and scouring tendencies" (R4, tab 1 at 428-29).

22.  The contract incorporated the full text of Federal Acquisition Regulation (FAR) 52.236-3, SITE INVESTIGATION AND CONDITIONS AFFECTING THE WORK (APR 1984) (R4, tab 1 at 573-74).

23.  The contract incorporated FAR 52.249-10, DEFAULT (FIXED-PRICE CONSTRUCTION) (APR 1984) (R4, tab 1 at 53, 163-64).

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

Identification of Weather-Related Web Sites in the Contract

24. The Summary of Work section of the contract referred offerors to section 00 33 50, stating that it provided "data links and information to where the Contractor can ascertain the weather conditions that could be encountered at the project location" (R4, tab 1 at 210). Section 00 33 50 provides links to web sites maintained by USACE, the National Oceanic and Atmospheric Administration (NOAA), the National Data Buoy Center, and the Florida Institute of Technology Coastal Processes Research Center Group (R4, tab 1 at 205).

25. USACE contends that these web sites would have provided bidders relevant information with respect to conditions near the site (tr. 12). During oral argument, USACE's attorney represented that one could identify "the sea conditions, just by going to the NOAA website" (tr. 14). But USACE has not provided the Board with any declarations or exhibits that demonstrate site specific information that offerors could have obtained.

26. SFI observes that the one data point specifically identified in the contract is 10 miles out to sea in 69 feet of water, which SFI portrays as irrelevant to the work site (ASGI ¶ 87; tr. 47-48). SFI represents that the NOAA web site does not provide any information with respect to underwater visibility (tr. 41). SFI also contends that it would be "inherently unreasonable" for offerors to send divers down to examine the working conditions prior to submitting their offers (tr. 43-44), albeit without a supporting declaration or other record evidence.

27. USACE did not make any representations in its brief as to what information was available on the listed web sites concerning water clarity or what steps an offeror should have taken to determine water clarity.

28. The Board considers the nature of the information that could have been obtained from these web sites to be disputed. However, the Board also observes that there is no allegation that SFI or any other interested contractor complained to USACE prior to bid that the listed web sites failed to provide site specific information.

SFI's Calculation of Expected Adverse Weather Days

29. Section 00 33 50 included a chart of the average number of days per month in which rainfall exceeded 0.1 inches. For the April to September period, these were: April 3.5 days, May 4.7, June 9.2, July 8.7, August 10.4, and September 9.3. (R4, tab 1 at 206)

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

30. SFI's president, James Royo, states in a declaration that SFI did not construe this chart as predictive of adverse weather days because light or brief rain would have minimal impacts on its work (ASGI, ex. C ¶¶ 1, 11). He stated that, in preparing its bid, SFI calculated the number of anticipated adverse weather delays "by using prior weather data to correlate wind speeds with wave heights." SFI calculated the days in which it would be unable to work due to weather, but its calculation was "significantly less" than the number of days in which there were rainfall of at least 0.1 inches. Mr. Royo did not disclose the number of weather days that SFI calculated.
(ASGI, ex. C ¶¶ 11-12)

SFI's Work on the Project

31. USACE issued a notice to proceed on November 29, 2016 (R4, tab 3 at 1).

32. SFI indicated in its initial project schedule that it would begin placing mats on May 9, 2017, and place the last mat of the season on October 20, 2017. SFI further indicated that in 2018 the first placement would be on April 16 and the last on October 2. (ASGI ¶ 101)

33. SFI did not begin work until June 20, 2017 (app. Supp. R4, tab 50 at 24). SFI placed the first mat on June 27, 2017 (GSUMF ¶ 40 & app. Resp. to GSUMF ¶ 40).

34. SFI does not allege that its late start was due to the weather or sea conditions. As the Board described in *Shoreline Foundation, Inc.*, ASBCA Nos. 62876, 63616, 23-1 BCA ¶ 38,468 at 186,974, Shoreline contended that the late start was due, at least in part, to a bid protest to which it attributed 54 days of delay (*see* ASGI ¶ 99). However, SFI did not submit a claim to the contracting officer seeking this extra time and we dismissed SFI's delay claim related to the bid protest for lack of jurisdiction. *Shoreline Foundation,* 23-1 BCA ¶ 38,468 at 186,975-77. The effect of missing nearly half the first placement season on SFI's ability to timely complete the project is not at issue in this motion.

35. SFI informed the CO by letter dated October 10, 2017, that it was demobilizing for the season. SFI stated "it was SFI's intent to continue operations longer, however deteriorating weather conditions since September 4, 2017, Hurricane Irma, have hampered our ability to return to normal operations. The sea conditions present a clear present danger to both the divers and barge personnel." (R4, tab 14)

36. On March 5, 2018, CO Paul Cotter wrote to SFI to complain about the lack of progress and to direct it to submit a recovery schedule (R4, tab 20). Among other things, he stated that SFI had demobilized after placing the mats at Site 1 and less than 50% of

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

the mats at Site 2 (on a project with 10 sites). He acknowledged that there had been excusable weather delays in September 2017, based on what he described as "several tropical storms" but noted that SFI had not requested a time extension and that it was 225 days behind schedule. (R4, tab 20 at 1-2).

37. SFI submitted a recovery schedule showing final completion by December 1, 2018 (R4, tab 23). In 2018, SFI added a materials barge and a second tugboat, an additional personnel transportation skiff, more dive personnel, and paid its supplier to accelerate mat fabrication (ASGI, ex. C ¶ 23; app. supp. R4, tab 50 at 16, 23). But SFI did not complete the work and on September 28, 2018, it notified USACE that it was demobilizing for the season, citing "deteriorating weather conditions since September 20, 2018" (R4, tab 33).

38. SFI mobilized for a third season in 2019. SFI contends that it placed the last reef mat on June 22, 2019, and on that date the project was "ready for use" (compl. dated June 29, 2023, ¶ 54). USACE contends that SFI completed the work on August 1, 2019 (GSUMF) ¶ 55). It is not immediately clear what occurred between June 22 and August 1, 2019.

39. On October 21, 2020, SFI submitted a certified claim seeking $2,838,231 and a 245-day time extension (app. supp. R4, tab 50 at 1, 21, 23, 30). The 32-page claim cites defective specifications, superior knowledge, and specifically the weather in 2017 and 2018 as the cause of the delays (*id.* at 3-4, 14, 21-22). The defective specifications theory alleged that the contract inaccurately identified the months in which the weather would allow SFI to work at the site (*id.* at 3, 8-12). The superior knowledge theory was that USACE had superior knowledge about weather conditions and the limitations on placement activity caused by the weather (*id.* at 3-4).

40. Many of the allegations in the claim focused upon what SFI contended were difficult sea or weather conditions in April, May, and September. Among other things, SFI stated:

> The weather conditions that SFI encountered in April, May and September of both 2017 and 2018 differed vastly from the working conditions forecasted in the Contract Documents. During the referenced months, wind speeds routinely exceeded 15 meters per second, and waves exceeded 1 meter, creating murky underwater conditions that rendered the requisite underwater diving operations unsafe, as well as impeding the ability of the crane barge to remain on position

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

> for the precision mat placement requirements. (citation
> omitted)
>
> . . . [W]hile SFI was able to work on 93.5% of the available
> workdays during the months of June, July and August of 2018
> and 2019, due to the harsh weather conditions, SFI worked
> only 81.0% of the available work days between June and
> August 2017, and 11.1% of the available work days in
> September 2017.  In April and May 2018, SFI was able to
> work on only 46.2% of the available days and on only 29.2%
> of the available days in September 2018.

(*Id.* at 13)

41.  On March 26, 2021, CO Griselle Gonzalez-Aquino denied the claim (R4, tab 49).

42.  SFI filed a timely appeal on April 6, 2021, that the Board docketed as ASBCA No. 62876.[6]

SFI's Complaint

43.  SFI filed a complaint on May 14, 2021, that contains a single count of breach of contract.  SFI alleges in this count that USACE:

> failed to perform and/or fulfill its obligations to SFI under the
> Contract including but not limited to by: (i) failing to provide
> accurate, complete, and feasible plans, specifications, and
> other designs documents; (ii) failing to advise SFI of its
> actual knowledge of climatic conditions at the Project site and
> the associated limitations imposed by such conditions on
> SFI's work; (iii) failing to reject SFI's work plan and or to

---

[6]  While litigation of that appeal was ongoing, on February 16, 2023, CO Gonzalez-Aquino issued a second final decision. In this decision she stated that USACE had granted SFI excusable, but non-compensable, weather days and assessed liquidated damages in the amount of $249,690.  SFI filed a timely notice of appeal on May 12, 2023, that the Board docketed as ASBCA No. 63616.  *Shoreline Foundation, Inc.*, 23-1 BCA ¶¶ 38,468 at 186,974.  The appeals were consolidated on May 16, 2023.

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

advise of its lack of feasibility; (iv) failing to equitably adjust
the Contract per SFI's request; (v) denying the Claim.

Compl. ¶ 39.

44. SFI's opposition to USACE's motion for partial summary judgment described its theories as "misrepresentation, failure to disclose superior knowledge, and deficient design" (app. opp'n at 1).

45. SFI's first supplemental brief submitted after oral argument states that SFI has three legal theories: (1) breach of contract/defective specifications; (2) breach of contract/superior knowledge; and (3) breach of contract/acceleration. It further states that the breach of contract/defective specifications theory encompasses "three sub-theories: (a) breach of the implied warranty of the performability/feasibility of the specifications; (b) breach of the implied warranty of accuracy of the specifications; and (c) USACE's breach of its own internal design standards (including failing to provide the anticipated adverse weather chart required by ER 415-1-15)." SFI further states that the breach of contract/acceleration theory encompasses "sub-theories of directed acceleration and constructive acceleration." (App. First supp. Br. At 6)

DECISION

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). When considering a motion for summary judgment, the Board's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. When considering a summary judgment motion, "all evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable factual inferences should be drawn in favor of the nonmoving party." *Dairyland Power Co-op. v. United States*, 16 F.3d 1197, 1202 (Fed. Cir. 1994) (citing *Liberty Lobby*, 477 U.S. at 255; *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)).

I. Weather Delays Are Generally Not Compensable

As the Court of Claims explained, "[w]eather conditions generally are considered to be acts of God. Neither party is obligated to the other for additional costs or price increases resulting solely from acts of God." *Turnkey Enters., Inc. v. United States*, 220 Ct. Cl. 179, 186 (1979). Weather is not a risk that is shifted to the government by the Differing Site Conditions or Changes clauses. *Id.* In general, contractors are entitled to additional time, but not money, for unusually severe weather per the Default Clause

11

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

incorporated in this contract (SOF ¶ 23; FAR 52.249-10(b)(1)(x)). *Luhr Bros., Inc.*, ASBCA No. 52887, 01-2 BCA ¶ 31,443 at 155,292.

Furthermore, to be entitled to an extension of time for unusually severe weather, the contractor must show that the weather was more severe than ordinarily encountered. *Cape Ann Granite Co. v. United States*, 100 Ct. Cl. 53, 72 (1943) (citing *United States v. Brooks-Callaway*, 318 U.S. 120 (1943); *Caribbean Engineering Co. v. United States*, 97 Ct. Cl. 195, 229 (1942)). SFI has not attempted to show that the weather in April to September in 2017 and 2018 was more severe than the weather in the preceding years.

SFI attempts to avoid these general rules by relying upon defective specifications, misrepresentation, and superior knowledge theories.

II. Defective Specifications

"When the government issues design specifications of a detailed nature . . . it warrants the sufficiency and efficacy of those specifications to produce the desired product in a satisfactory manner." *Ordnance Rsch., Inc. v. United States*, 609 F.2d 462, 479 (Ct. Cl. 1979) (citing *La Crosse Garment Mfg. Co. v. United States*, 432 F.2d 1377 (Ct. Cl. 1970); *J.D. Hedin Constr. v. United States*, 347 F.2d 235 (Ct. Cl. 1965)). "If such specifications prove defective or impossible to perform, the government must compensate the contractor for the additional costs of performance." *Id.* (citing *United States v. Spearin*, 248 U.S. 132 (1918)). "The *Spearin* doctrine provides that if a government contract contains detailed design specifications, as opposed to performance specifications, the government gives an implied warranty that if the specifications are followed an acceptable result will be produced." *Rick's Mushroom Serv., Inc. v. United States*, 521 F.3d 1338, 1344 (Fed. Cir. 2008) (citing *Stuyvesant Dredging Co. v. United States*, 834 F.2d at1576, 1582 (Fed.Cir.1987)). "Design specifications explicitly state how the contract is to be performed and permit no deviations. Performance specifications, on the other hand, specify the results to be obtained, and leave it to the contractor to determine how to achieve those results." *Id.* at 1344, n.3 (quoting *Stuyvesant Dredging*, 834 F.2d at 1582).

The parties disagree as to whether the specifications in this appeal are best characterized as design or performance specifications. Because we conclude that SFI is not entitled to recover based on any reasonable reading of the contract we need not resolve whether the specifications are design or performance.

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

A.  <u>The Contract Allocated the Risk of Evaluating Weather to SFI</u>

At its most basic level, SFI's claim is that the wind, waves, and the clarity of the water were worse than it expected (SOF ¶ 40).  While the contract made no representations as to precise wind speeds, wave heights, or water clarity, it did disclose that the site was subject to stormy, windy, and rainy conditions year-round (SOF ¶¶ 19, 20).  The contract identified some basic aspects of the weather that a Florida-based contractor would already know, namely that dangerous thunderstorms can occur at any time of the year and that the placement season largely overlapped with the "wet season," as well as the hurricane and tropical storm season (*id.*).  But, beyond these general warnings, the contract demonstrates a clear effort by USACE to place responsibility on SFI to educate itself as to the weather and sea conditions and to price the work accordingly.

The contract provisions that required SFI to ascertain the weather conditions included section 01 11 00, Summary of Work, which provided that "[t]he Contractor shall be responsible for obtaining information concerning rain, wind and wave conditions that could influence safety, dredging and disposal operations prior to submitting a proposal or bid" (SOF ¶ 19).  Similarly, section 00 33 50, Weather and Water Stage Data, provided that "[i]t shall be the contractor's responsibility to obtain information concerning weather conditions in the project area" (SOF ¶ 20).  And section 35 32 30, at paragraph 1.5.4, Working Environment, provided "[t]he Contractor shall ascertain the environmental conditions which can affect water and land access, such as climate, terrain, winds, current, waves, swells, depths, shoaling, and scouring tendencies" (SOF ¶ 21).

The specific references to weather, climate, winds, current, waves, and safety put SFI on notice that it was its responsibility to determine how these conditions would affect its ability to bring mats to the site and place them on the ocean floor (*see* SOF ¶ 5).

In addition, the contract incorporated FAR 52.236-3, SITE INVESTIGATION AND CONDITIONS AFFECTING THE WORK (APR 1984) (SOF ¶ 22).  This clause provides, in part:

> (a) The Contractor acknowledges that it has taken steps reasonably necessary to ascertain the nature and location of the work, and that it has investigated and satisfied itself as to the general and local conditions which can affect the work or its cost, including but not limited to (1) conditions bearing upon transportation, disposal, handling, and storage of materials . . . (3) uncertainties of weather, river stages, tides, or similar physical conditions at the site . . . (5) the character

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

of equipment and facilities needed preliminary to and during
work performance . . . . Any failure of the Contractor to take
the actions described and acknowledged in this paragraph will
not relieve the Contractor from responsibility for estimating
properly the difficulty and cost of successfully performing the
work, or for proceeding to successfully perform the work
without additional expense to the Government.

(b) The Government assumes no responsibility for any
conclusions or interpretations made by the Contractor based
on the information made available by the Government.

FAR 52.236-3(a)-(b).

The Board reads the requirement in this clause to investigate and determine the
cost of "conditions bearing upon transportation . . .[and] handling . . . of materials" to
include the transportation of the mats across the water, and the handling of them at the
site. The Board reads the requirement to investigate and determine the impact on cost of
"uncertainties of weather" to include the wind, and the reference to "weather, river
stages, tides, or similar physical conditions at the site" as broad enough to encompass the
water conditions at the site. The Board reads the requirement to identify "the character of
equipment and facilities needed . . . during work performance" as requiring SFI to make
its own judgment as to the equipment needed at the site given the prevailing weather
conditions.

Taken together, these four clauses demonstrate a clear intent to allocate to SFI the
risk of determining how future sea and weather conditions would impact the cost and
difficulty of the work.

B. The Placement Season Clause

SFI builds most of its case on the Placement Season clause (SOF ¶ 17). SFI
contends that it read this clause as a representation and/or a warranty that the work could
be performed from April to October (app. opp'n at 7-11, 17-22). The Board does not
agree with this interpretation.

While SFI relies heavily upon the second sentence of this clause, we believe that
the first sentence is equally, if not more, important. The first sentence states: "[a]
placement season will be defined on the Contractor's project schedule as to when
seasonal weather patterns that will allow placement operations at selected reef sites"
(SOF ¶ 17). The Board reads this sentence in the context provided by the provisions

14

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

discussed above requiring SFI to investigate the weather and environmental conditions. Thus, SFI had the responsibility to use the information it accumulated to "define" when "seasonal weather patterns" would "allow placement" at the 10 reef sites. In other words, SFI had to use its own judgment to determine when the weather would allow placement, with SFI taking into consideration its own skills and resources.

The second sentence of this paragraph states: "[i]t is anticipated that the placement season may occur between April 1st and October 1st" (SOF ¶ 17). In our view, SFI reads far too much into this sentence because the words "anticipated" and "may occur" are too vague or imprecise to provide a warranty.

SFI does not explain precisely what it interpreted this sentence to mean, that is, it does not explain exactly how many suitable weather days it believed USACE was warranting. But any reasonable contractor would have understood that future weather was not so predictable that USACE could guaranty that calm seas would appear precisely on April 1. The phrase "may occur between April 1st and October 1st" proved to be accurate in the sense that work did occur in every month from April through September (SOF ¶ 40). For example, in April-May 2018 (the only year SFI attempted to place mats in those months (SOF ¶ 33)), SFI represents that it was able to work on 46.2% of workdays (SOF ¶ 40). We understand that SFI was disappointed by this number, but we do not read the contract as representing that there would a minimum number of good weather days (higher than 46.2%) in these two months.[7]

The Board holds that it would make little sense to require the contractor to analyze the weather and sea conditions and define when the seasonal weather would allow placement if the government warranted suitable weather from April 1 to October 1. Read in context with the rest of the contract (including identification of April as the last month of the inclement weather season (SOF ¶ 18)) and the general unpredictability of weather, we read the phrase "[i]t is anticipated that the placement season may occur between April 1st and October 1st," as merely a general statement as to the months in which placement may (or might) be possible. But it was ultimately up to SFI to determine when it could place the mats.

---

[7] SFI states in its second supplemental brief that it interpreted the contract to mean that there would be "only a handful of adverse weather delay days" during April (app. second supp. br. at 7). The Board sees no warranty or representation by USACE that there would only be a "handful" of adverse weather days.

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

C. April

Our interpretation of the Placement Season clause as not warranting good weather is bolstered by the observation that, at first blush, the contract seems to have been of two minds when it came to mat placement in April. On the one hand it defined the placement season as April 1 to October 1, but it also stated that the inclement weather season is from November 1 to May 1 (SOF ¶¶ 17-18). Thus, April is part of both the inclement weather season and the placement season.

When interpreting a contract, we must read the instrument as a whole "so as to harmonize and give reasonable meaning to all of its parts." *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004) (citing *McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1434-35 (Fed. Cir. 1996)). We conclude that the clauses defining the inclement weather and placement seasons can be harmonized.

Reading the solicitation in August of 2016 (SOF ¶ 1), we believe that any offeror would have known that USACE could only make statements as to the general weather pattern in an area and could not predict the weather one to two years in advance. For example, USACE could state the approximate duration of the season for hurricanes and tropical storms (SOF ¶ 20), but it could not predict how many storms there would be or when they would occur. Similarly, USACE could not predict the weather in April, May, and September of 2017 and 2018. Thus, USACE could not have known the precise date when the inclement weather season would end, or if it would even have a precise end date rather than a gradual change.

The sentence defining the inclement weather season supports the interpretation that USACE was not attempting to predict the weather in 2017 and 2018. It provides: "the area where placement sites are located experience inclement weather which *typically* occurs between November 1st and May 1st" (SOF ¶ 18) (emphasis added). This means that, typically or generally, the inclement weather season stretches from November 1 to May 1, but, by implication, any particular year could have a longer or shorter season. In other words, the weather might be quite nice on November 1. This also means that in any particular year April and even May could have inclement weather that would make placement difficult.

This interpretation is consistent with the placement season clause which, as we have already discussed, stated that it was "anticipated" that placement "may occur" between April 1 and October 1. These words do not portray certainty. Reading the language of the clauses together, and keeping in mind the inherent unpredictability of weather, one can see that the contract provided only an estimate, or a general guideline, of the duration of the placement and inclement weather seasons.

16

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

If the contract cannot be harmonized in this fashion, then we would have to treat the contract as plainly inconsistent as to whether April was a suitable month for performing work.  But this does not help SFI.  A patent ambiguity such as that would have required SFI to seek clarification prior to bid, but SFI did not seek clarification. *NVT Techs*, 370 F.3d at 1162.

### D.  Misrepresentation

Because SFI seems to be pursuing a misrepresentation claim under the rubric of defective specifications, we address it here.

The Court of Claims considered a comparable misrepresentation claim in *L.G. Everist, Inc. v. United States*, 231 Ct. Cl. 1013 (Ct. Cl. 1982).  *L.G. Everist* involved a streambank restoration project that required the contractor to obtain riprap.  *Id.* at 1014.  The government did not specify a quarry, but it verified whether there was at least one local source.  *Id.* at 1015.  A government geologist visited what was referred to as the Lackner quarry and concluded that it had enough rock for the project.  But he observed that there were extensive fissures and joints in the rock and opined that a determination to use the source should be contingent on test quarrying to evaluate the breakdown characteristics of the rock.  The government did not conduct any test quarrying and did not give the geologist's report to prospective bidders.  *Id.* During a pre-bid site visit, the government's area engineer told prospective bidders that the Lackner quarry was an approved source and had an adequate quantity of rock. *Id.* at 1016-17.

The plaintiff conducted its own review of the site by an employee with experience in evaluating quarries.  He made very similar observations as the government geologist with respect to the jointing and fissuring of the rock.  But he recommended to his superior that the rock be used.  *L.G. Everist,* 231 Ct. Cl. at 1016-18.  When performing the work, the plaintiff obtained sufficient rock from the quarry but found that it had a 50% waste rate, which slowed production and increased costs. *Id.* at 1016.  The plaintiff filed suit alleging misrepresentation, among other things.  *Id.* at 1017.

The Court of Claims granted the government summary judgment, holding that it made no erroneous representations.  The Court held that the contract made no representation as to the amount of rock that would be wasted.  Nor did it make any representation as to the cost of quarrying the rock.  The Court held that the plaintiff understood this because it visited the site and made its own determination that the Lackner quarry would be the most economical.  *L.G. Everist,* 231 Ct. Cl. at 1017-18.

17

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

Similar considerations apply in this appeal. USACE made no representations as to how difficult it would be to work at the site. USACE did represent that the site was subject to rainy, windy and stormy conditions year-round (SOF ¶ 19), but this appears to have been true. And USACE made no specific representations as to water clarity, wave heights, or wind speeds. It made no representation as to the percentage of days in April, May and September that would have weather suitable for mat placement. SFI, like *L.G. Everist,* visited the site and made its own determination as to how much it would cost to perform the work (SOF ¶¶ 1, 30). Accordingly, because USACE made no misrepresentations, SFI cannot recover on a misrepresentation theory.

E. ER 415-1-15

SFI contends that a USACE regulation, ER 415-1-15, Construction Time Extensions for Weather (31 Oct 1989), required USACE to include a chart of adverse weather days in the contract (app. opp'n at 23-24; ASGI, ex. F). However, SFI did not raise this theory in its claim. A claim presented for the first-time during litigation must be considered a new and separate claim from the claim submitted to the CO if the claims "either request different remedies (whether monetary or non-monetary) or assert grounds that are materially different from each other factually or legally." *K-Con Bldg. Sys., Inc. v. United States*, 778 F.3d 1000, 1005 (Fed. Cir. 2015).

SFI's ER 415-1-15 claim is a new claim. It relies on a new legal theory, a supposed governmental duty to calculate the expected number of adverse weather days and to include them in the contract, and that the cited regulation gives the contractor a legal remedy. *See*, *e.g.*, *Am. Tel. & Tel. Co. v. United States*, 307 F.3d 1374, 1380 (Fed. Cir. 2002) (alleged violation of internal agency regulation held not actionable). It also alleges new operative facts, that USACE could have calculated the number of weather days in which offerors would be unable to place mats but it failed to do so. Accordingly, we lack jurisdiction to consider this claim. *K-Con*, 778 F.3d at 1006-07.

III. SFI's Superior Knowledge Claim

To recover under a superior knowledge theory, the contractor must prove four elements: "(1) a contractor undertook to perform without vital knowledge of a fact that affects performance costs or duration; (2) the government was aware the contractor had no knowledge of and had no reason to obtain such information; (3) any contract specification supplied misled the contractor or did not put it on notice to inquire; and (4) the government failed to provide the relevant information." *Grumman Aerospace Corp. v. Wynne*, 497 F.3d 1350, 1357 (Fed. Cir. 2007) (quoting *Giesler v. United States*, 232 F.3d 864, 876 (Fed. Cir. 2000)).

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

In terms of applying this test, it is undisputed that USACE had the Olsen 2007 report and did not provide it to SFI (SOF ¶¶ 9, 14). This report had several cautionary comments about the length of the placement season, the murkiness of the water, and the wave heights in which a contractor could place mats (SOF ¶¶ 11-12).

Other important facts are disputed or undeveloped. We briefly discuss them here.

First, the Olsen 2007 report was issued about nine years before the solicitation (SOF ¶¶ 1, 9). We do not know whether the project changed or evolved in those years and thus do not know the degree to which Olsen 2007 remained relevant.

Second, Olsen 2007 cast doubt on a contractor's ability to work in seas greater than 2-feet (SOF ¶ 12). But based on its expertise and equipment, SFI would be in the best position to determine the wave heights in which it could place mats. SFI calculated that it would be able to place mats in 4-foot seas (SOF ¶ 6). Thus, it is not clear if Olsen's opinion about the infeasibility of working in 3-foot seas would have changed SFI's bidding strategy.

Third, it is not clear if SFI could have obtained site-specific weather information from other sources, such as the NOAA and other web sites listed in the contract (SOF ¶¶ 24-28).

Fourth, it is not clear what steps a reasonable bidder would be expected to take to prepare an offer on a contract such as this. The solicitation was issued, and the site visit occurred in August, which is one of the calmest months of the year (SOF ¶¶ 1, 12). However, the deadline for bids was September 26 (SOF ¶ 1). Based on SFI's experience in 2017 and 2018 the weather deteriorates in September (SOF ¶¶ 35, 37). It is not clear if SFI could have identified the wind and wave conditions in September 2016.

Fifth, with respect to Olsen's statement that the site has "chronically limited, near-zero underwater visibility" (SOF ¶ 11), it is not clear why SFI could not have observed this in August-September 2016. We have SFI's representation at oral argument that it would be unreasonable to bring divers to the site, but no declarations or other evidence (SOF ¶ 26). We have no evidence as to what other measures an offeror could have taken to determine how visible the water is. We have no representations at all from USACE as to what an offeror could have learned concerning the water visibility.

19

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

The decision of the Court of Claims in *Hardeman-Monier Hutcherson v. United States*, 458 F.2d 1364 (Ct. Cl. 1972), supports the denial of summary judgment on superior knowledge. *Hardeman* involved a Navy contract that required, among other things, the construction of a pier in a remote area of Australia. Prior to issuing the solicitation, the Navy obtained two reports indicating that the construction area was subject to high winds, strong currents, and rough seas. *Id.* at 1365-66. The Navy did not provide the reports to bidders. *Id.* at 1367. The solicitation, similar to this appeal, informed bidders of rainfall amounts and that the site was subject to cyclones but otherwise instructed bidders to perform their own site and weather investigation. *Id.* at 1366-67. The contractor, like SFI, contended that it inspected the site and reviewed various records but that it did not learn the severity of conditions. *Id.* at 1367. During performance, the contractor found that the sea conditions were worse than it expected, and that it was able to work only 40% of the time. *Id.* at 1367-68.

The Court of Claims denied relief under the Changed Conditions clause, in part because of the general rule that the risk of weather is not transferred to the government under this clause, but also because the contract contained no affirmative representations of the sea conditions. *Hardeman*, 458 F.2d at 1370-71. This is consistent with our summary of the law concerning weather delays in section I above and our holding with respect to misrepresentation in section II.D.

By contrast, the Court of Claims held that the contractor was entitled to recover for a breach of contract due to the failure to furnish the reports indicating the difficulty posed by the weather and sea conditions. The Court stated "[i]t is well settled in this court that where the Government possesses special knowledge, not shared by the contractor, which is vital to the performance of the contract, the Government has an affirmative duty to disclose such knowledge." *Id.* at 1371-72. The Court found that the withheld reports contained "vital information concerning the weather and sea conditions at the site" and that the "the weather and sea conditions were of paramount importance in the performance of the contract . . . ." *Id.* at 1372. The Court concluded by holding that the government "had a duty to disclose and share its superior knowledge and the failure to discharge this duty constituted a breach of contract." *Id.*

One of the key facts in *Hardeman* seems to have been that the two reports at issue were issued after a one-month site visit in 1961 and a two-month visit in 1962. Preparing these reports seems to have required far more effort than a bidder could reasonably have taken. *Hardeman*, 458 F.2d at 1365-66. In this appeal, Olsen spent years studying the site. Olsen and/or Dr. Bodge issued at least six reports between 2005 and 2016 that USACE cited in the DDR (SOF ¶ 9). In addition, Dr. Dally spent an unknown amount of time preparing the wave model and producing the Dally Data that Olsen relied upon in preparing Olsen 2007 (SOF ¶ 10).

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

With respect to the Olsen 2007 report, over 10 months passed between the time that Olsen obtained the Dally Data and the date that it issued its 2007 report (SOF ¶ 10).  This is far more time than offerors had to prepare their bids: approximately 1.5 months (SOF ¶ 1).  Construing the facts in the light most favorable to SFI and making all reasonable inferences in its favor, there is a plausible basis to conclude that the Olsen 2007 report contained vital information about the site, that SFI would not have known about the report, that USACE would have known that SFI did not have it, and that SFI did not have enough time before offers were due to recreate the Olsen 2007 report.

Accordingly, the Board concludes that a hearing is warranted on SFI's superior knowledge claim.

IV.  <u>Acceleration</u>

USACE also moves for summary judgment on SFI's acceleration claim.  As described above, breach of contract/acceleration is one of the prongs of the breach of contract alleged by SFI (SOF ¶ 45).

As stated by SFI's counsel at oral argument "acceleration is a component of our damages under both the defective specs and the superior knowledge theories" (tr. 84).  Because of the connection between SFI's defective specifications and superior knowledge theories the Board will defer ruling on the acceleration theory until we have resolved the superior knowledge claim.  Board R. 7(a).

<u>CONCLUSION</u>

Respondent's motion for partial summary judgment is granted with respect to defective specifications and misrepresentation but denied as to superior knowledge.

Dated:  June 6, 2024

MICHAEL N. O'CONNELL
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

(Signatures continued)

21

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

I concur

I concur

OWEN C. WILSON
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

DAVID B. STINSON
Administrative Judge
Armed Services Board
of Contract Appeals

      I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 62876, 63616, Appeals of Shoreline Foundation, Inc., rendered in conformance with the Board's Charter.

      Dated:

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals

22